In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1443

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL S. SLAIGHT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09-CR-40030—**Michael M. Mihm**, *Judge*.

ARGUED AUGUST 4, 2010—DECIDED SEPTEMBER 2, 2010

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant pleaded guilty to receipt and possession of child pornography shipped in interstate or foreign commerce, subject to a right to appeal the denial of his motion to suppress incriminating statements that he had made when questioned by federal officers at a police station. He received a mandatory minimum sentence of 15 years by reason of a previous conviction for aggravated sexual abuse of a

child under 13 years of age. 18 U.S.C. § 2252A(b)(1); *United States v. Gross*, 437 F.3d 691, 692 (7th Cir. 2006).

The *Miranda* rule forbids questioning a person who is in custody unless he is first told that he has certain rights, such as a right to remain silent. If the rule is violated, the answers to the questions asked him are inadmissible in evidence. Police sometimes are restive under the restraints imposed by the rule and seek to circumvent it by avoiding the appearance of custody, see, e.g., *Thompson v. Keohane*, 516 U.S. 99, 102-03 (1995); *United States v. Garcia*, 376 F.3d 648 (7th Cir. 2004), since the rule does not apply to noncustodial interrogations. "Police recast what would otherwise be a custodial interrogation as a non-custodial interview by telling the suspect that he is not under arrest and that he is free to leave—sometimes even after detectives have transported the suspect to the stationhouse with the express purpose of questioning him inside the interrogation room and eliciting incriminating information." Richard A. Leo, "Questioning the Relevance of Miranda in the Twenty-First Century," 99 *Mich. L. Rev.* 1000, 1017 (2001). (That is this case.) One police manual advises that "if . . . the subject appears to be uncooperative and not likely to waive [his *Miranda* rights], consider taking the coerciveness (i.e., the 'custody') out of the interrogation by simply informing him that he is not under arrest . . . , when practical to do so under the circumstances, and interview the subject without a *Miranda* admonishment and waiver." Quoted in Charles D. Weisselberg, "Mourning *Miranda*," 96 *Cal. L. Rev.* 1519, 1542-43 (2008). Professor Weisselberg points out that

*Miranda* is underinclusive because it ignores pre-arrest interactions between police and a suspect that may influence the suspect's willingness to talk. *Id*. at 1545. "[I]nterrogation is part of a seamless sequence of events, and there are strategic considerations that govern every step in that sequence, beginning with initial contacts with suspects." *Id.* at 1547-48; see also Yale Kamisar, "On the Fortieth Anniversary of the *Miranda* Case: Why We Needed It, How We Got It—And What Happened to It," 5 *Ohio St. J. Crim. L.* 163, 187-88 (2007).

In the present case, federal law enforcement officers in Rock Island, Illinois, assisted by local police, made ingenious, pertinacious, but ultimately (as it seems to us) transparent efforts to disguise a custodial interrogation as noncustodial.

Searching pornographic peer-to-peer sites on the Internet, federal agents discovered that Michael Slaight of Rock Island had downloaded child pornography to his computer in violation of federal law. They obtained a warrant to seize and search the computer, which they assumed correctly was in his home. They could easily have obtained an arrest warrant as well—they had ample probable cause to believe he had violated federal law. But had they arrested him they would have had to give him the *Miranda* warnings before questioning him; and the assistant U.S. attorney who argued for the government on appeal acknowledged forthrightly that the officers wanted to question Slaight without giving him the warnings. The particular admission that they wanted to extract from him was that no one besides himself had

had access to his computer. That possibility was the one chink in an otherwise airtight case.

At 7:45 a.m. one morning in March, nine (possibly ten) federal and local officers arrived at Slaight's home. They knocked on the door and when no one responded they forced it open with a battering ram and entered the house with drawn guns, including assault rifles. (As the judge put it at the suppression hearing, "I'm sure they were yelling at him, small house, all that, but it's also true that later on the guns were holstered . . . . There is something that is almost inevitably intimidating about the environment at that time.") They found Slaight in the house, together with a woman, whom they had not known about; they had assumed he lived alone. They testified at the suppression hearing that they had planned to interview him at his house. We find that hard to believe (the judge made no finding). They had already reserved a tiny windowless interview room at the police station for interviewing him. At the suppression hearing they gave implausible reasons, as we are about to see, for not interviewing him at his home, and false testimony about his being free to leave the tiny room. The federal courthouse was only two blocks from the police station and had interview rooms, and the investigation of Slaight was federal although local police assisted, but the law enforcement team undoubtedly wanted the questioning to take place in the more intimidating environment of a police station. The government argues that the interview rooms in the courthouse may not have had the kind of nifty audio-visual equipment that had been installed in the police

station's interview room. But the argument belies the officers' testimony that they would have been happy to interview Slaight in his home had it not been for reasons (discussed in the next paragraph) that are unrelated to the fact that it was not equipped with such equipment.

They testified that the windows of the house were covered with garbage bags and other materials and as a result there was very little natural light in the house. But the house had electricity and the officers gave no reason why an interview, unlike painting a landscape, requires natural rather than artificial light. They also testified that the house "had a strong smell of cats"—a risible reason for unwillingness to conduct an interview; police smell much worse things in the line of duty. It is true that cat allergies can be serious; a common allergic reaction to a cat is an asthmatic attack; and one officer actually testified that he and another officer are allergic to cats. But apparently not seriously so, for his response to the smell of the resident cat was merely to open a door to air out the house, and the government does not suggest that fear of allergic reactions was one of the reasons for not wanting to interview Slaight in his home.

The officers testified that they wanted to interview the woman they had found in the house as well as Slaight, and, since it was a small house, though the dimensions are not in the record and it had two bedrooms as well as a living room, they were afraid that the interview of each occupant would be audible to the other. But that

would have been unlikely had each been interviewed at the same time in a different bedroom, since the bedrooms were separated by the living room. Or the police could have asked one of the two to sit in one of their vehicles while the other was interviewed, and then switch places. After two of the officers escorted Slaight from the house two other officers interviewed the roommate in the house, despite the lack of natural light and the cat smell and the further fact offered as a reason for wanting to take Slaight to the police station for interviewing that there was only one chair in the living room.

The officers did not *command* Slaight to come with them to the police station. They merely told him they'd prefer to interview him there. They even offered to let him drive himself to the police station—yet they knew that his driving license had been suspended, so there was little danger he would accept the invitation. Anyway he didn't have a car.

He went with two of the officers in their car and found himself in the tiny interview room in the police station. We don't know whether the police station—the main police station of Rock Island, a town of 35,000—has any larger interview rooms. The room's dimensions are not in the record (we've previously noted with displeasure lawyers' indifference to exact measurements, e.g., *St. Margaret Mercy Healthcare Centers v. NLRB*, 519 F.3d 373, 375 (7th Cir. 2008); *Coffey v. Northeastern Illinois Regional Commuter R.R (METRA)*, 479 F.3d 472, 478 (7th Cir. 2007)), but the surveillance video of the interrogation makes clear that the room was minute. One officer

testified that it was eight feet by eight feet, another that it was five by seven. The two officers, both large men, plus Slaight and a desk and three chairs, pretty much filled up the room. The judge was critical: "I would strongly suggest that that room should never, ever be used to take voluntary statements. Frankly, I have been knocking around this stuff for over 40 years. That's the smallest interrogation room I've ever seen." The door of the room was closed throughout the interview and, as we said, the room has no windows.

The police repeatedly told Straight that he was free to leave, although they didn't offer to drive him home; his home was close by but we don't know how close by—whether it was within walking distance and if not whether he had money for a cab. To leave the interview room he would have had to brush by one of the officers, whose seat was so close to the door that the officer might have had to move his chair to allow Slaight to exit without touching him. ("Officer, may I please squeeze by you?") Slaight knew the police had him nailed so far as illegal possession of computer images was concerned, and he couldn't have believed they would actually let him go. After being told by the officer inter-viewing him that he was not in custody and was there-fore free to leave, Slaight said that he had no choice but to remain because they were going to arrest him any-way. The officer did not demur. The judge criticized him for not responding to Slaight "Now wait a minute. You've just told me that you had no choice. Let's talk about that. We need to clarify that." The judge said that Slaight "might as well have said 'I did not come down

here voluntarily,'" and "when someone says something like that, the investigating officer has to stop and make a record, which was possible here because of the videotape, and clear that up. That wasn't done."

The interview lasted an hour. The interviewing officer plied Slaight with questions, and admitted at the suppression hearing that his goal was to get Slaight to incriminate himself. He wasn't trying to determine whether Slaight had committed a crime; he knew he had; he just wanted to tie up a possible loose end. Asked by Slaight's lawyer whether "the more you keep the guy talking, as you've been trained, the more you can guide and draw from that statements, admissions, inferences, anything that may tend to incriminate him, correct?," the officer answered: "Correct."

Toward the end of the interview Slaight asked to be permitted to leave the room to smoke a cigarette. The request was refused; and later when the officers left the room for forty minutes to find out what had been discovered in Slaight's computer they locked him in. They denied this, but admitted that the door was locked when they returned. Yet at the suppression hearing one of the officers testified that had Slaight told the officers that he wanted to leave, buy a plane ticket, and fly to Guatemala, they would have let him go even though they had enough evidence to arrest him. The district judge said: "I find that impossible to believe." We don't believe it either.

After the officers returned to the interview room they gave Slaight the *Miranda* warnings, as they had been

told to do by the assistant U.S. attorney directing the investigation. Slaight promptly clammed up—too late.

Custody for *Miranda* purposes is a state of mind. When police create a situation in which a suspect reasonably does not believe that he is free to escape their clutches, he is in custody and, regardless of their intentions (not that there's any doubt about what those intentions were in this case), entitled to the *Miranda* warnings. *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004); *Thompson v. Keohane, supra*, 516 U.S. at 112; *United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008). That is what the police in this case did. They made a show of force by arriving at Slaight's house en masse. Though he has a criminal record not limited to child sexual abuse and receipt of child pornography, none of his crimes was of a character to make police think him a menace to them; they were crimes such as driving under the influence, shoplifting, disorderly conduct, and substance abuse. None involved weapons. Yet nine officers drove up to the house, broke in with a battering arm, strode in with pistols and assault rifles at the ready, and when they found him naked in his bed ordered him, in an "authoritative tone" and guns pointed at him, to put his hands up.

We are not disposed to question the safety measures that police employ when entering a house to serve a search warrant. The measures taken in this instance seem excessive, but we withhold judgment. What is undeniable is that the presence of overwhelming armed force in the small house could not have failed to intimidate the occupants. The police could have searched the house

thoroughly and taken the computer and left. They could have arrested Slaight—they had ample probable cause. But they had been careful not to procure an arrest warrant. Instead of leaving the house or arresting him they asked him whether he would "consent to a voluntary interview with us," and immediately followed up the request by asking him "if he would be willing to follow us to the Rock Island Police Department" for the interview. They didn't want to conduct the interview in his home because he would be in familiar surroundings and feel less compulsion to answer questions put to him, so they persuaded him to come to the police station and arranged to interview him in the claustrophobic setting of a windowless room the size of a bathroom. Since he knew they knew he'd violated federal law, he could not have believed they would let him go rather than arrest him if he tried to leave; they had the goods on him. Anyone in his situation would have thought himself in custody.

Despite having serious concerns about the coercive nature of the interrogation and having disbelieved a key bit of testimony by the government witness (the testimony that Slaight was free to leave the interview room regardless of his destination), the district judge concluded that Slaight had not been in custody until after he made the incriminating statements. The judge relied on the fact that the officers had repeatedly told Slaight that he was not under arrest and was free to leave, and that they had behaved politely toward him after entering the house and satisfying themselves that they were in

no danger from the occupants. The judge gave no weight to the other evidence that we have reviewed, evidence which shows that a "reasonable" person in Slaight's position (which just means the average person, as distinct from someone of abnormal timidity, *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir. 1984)) would have thought himself under arrest. Suppose he'd told the officers when they entered his house: "Take my computer, since you have a warrant to search it, and get the hell out." They would have arrested him, for if they left the house without him he might go into hiding or leave the state and it might be quite a bother to find him.

Even without reading the files in his computer, the officers, and the prosecutor guiding them, knew they had enough evidence not only to arrest Slaight but to convict him, once they ascertained that the woman whom they found in the house didn't have access to his computer. At a trial he could, had it not been for his admitting to the interrogating officer that only he had access to the computer, have testified that she had access to it as well—though who would have believed him? It is very rare for women to collect child pornography. Mark Motivans & Tracey Kyckelhahn, "Federal Prosecution of Child Sex Exploitation Offenders, 2006," *Bureau of Justice Statistics Bulletin* 5 (Dec. 2007), http://bjs.ojp.usdoj.gov/content/pub/pdf/fpcseo06.pdf (visited Aug. 31, 2010) (only 1 percent of those charged with child pornography crimes are female); Janis Wolak et al., "Child-Pornography Possessors Arrested in Internet-Related Crimes: Findings From the National Juvenile Online Victimization Study"

vii, 1-2 (2005), www.unh.edu/ccrc/pdf/jvq/CV81.pdf (visited Aug. 31, 2010) (less than 1 percent). And Slaight was a registered sex offender as a result of having been convicted for sexual abuse of his 12-year-old niece. He had every reason to believe he was in custody.

We do not question the judge's finding that the officer sitting in the chair next to the door of the interview room was not actually blocking it, as Slaight argues, and that the officers were polite and repeatedly told Slaight that he was free to terminate the interrogation and leave. But being polite to a suspect questioned in a police station and telling him repeatedly that he's free to end the questioning and leave do not create a safe harbor for police who would prefer to give *Miranda* warnings after the suspect has confessed rather than before. *United States v. Craighead*, 539 F.3d 1079, 1080 (9th Cir. 2008); *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007); *United States v. Bravo*, 295 F.3d 1002, 1011 (9th Cir. 2002).

The government acknowledges as it must that appellate review of a judge's finding that an interrogation was not custodial is plenary. *Thompson v. Keohane*, *supra*, 516 U.S. at 112, 115-16; *United States v. Cranley*, 350 F.3d 617, 619 (7th Cir. 2003). The facts that we have recited—none questioned by the district judge—persuade us that the average person in Slaight's position would not have felt free to leave the interview room even if (a closer question) that average person would have felt free to refuse the invitation to go to the police station for an interview. The facts are much like those of *United States v. Craighead*, *supra*, 539 F.3d at 1085-89;

*United States v. Colonna*, *supra*, 511 F.3d at 435-36, and *United States v. Mittel-Carey*, 493 F.3d 36, 39-40 (1st Cir. 2007), in all of which an ostensibly noncustodial interrogation was held to be custodial. The key facts are the show of force at Slaight's home, the protracted questioning of him in the claustrophobic setting of the police station's Lilliputian interview room, and the more than likelihood that he would be formally placed under arrest if he tried to leave because the government already had so much evidence against him. These facts are incontrovertible and show that the average person in Slaight's position would have thought himself in custody. Any other conclusion would leave *Miranda* in tatters.

REVERSED.