In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3811

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL J. BOROSTOWSKI,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:12-cr-10150-JES-JAG-1— **James E. Shadid**, *Judge.*

ARGUED SEPTEMBER 17, 2014 — DECIDED DECEMBER 31, 2014

Before FLAUM, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Michael J. Borostowski pled guilty
to an indictment charging him with one count of receiving
child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A)
and 2252A(b)(1); five counts of distributing child pornography
in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1);
and three counts of possessing child pornography in violation
of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). Borostowski

reserved his right to appeal the district court's denial of his motions to suppress. The district court sentenced him to 293 months of imprisonment, followed by a lifetime of supervised release. On appeal, Borostowski challenges the district court's conclusion that he was not in custody when officers questioned him on the day a search warrant was executed at his home, as well as the court's determination that a hard drive seized from his mother's car was within the scope of the search warrant. He also objects to his sentence. We reverse the district court's judgment in part, affirm in part, and remand for proceedings consistent with this opinion.

## I.

In June 2012, an informant allowed an agent of the Federal Bureau of Investigation ("FBI") to assume his online identity. The agent then used that identity to investigate an individual who had been corresponding with the informant using the email address mikeborostowski@yahoo.com. The person using that email address had offered to provide child pornography videos to the informant in exchange for a web camera session with a child. The undercover FBI agent subsequently received child pornography from the user of that email account in June and August 2012. The FBI then obtained a warrant directed to Yahoo! to search that email account. The search revealed exchanges in which the user of the account claimed to keep child pornography on an external hard drive. Michael Borostowski, the defendant here, had a prior conviction related to child pornography. Using information gleaned from that investigation, an agent applied for a warrant to search Borostowski's person, his 1993 red Chevrolet truck and the premises where he lived with his parents, Dollie and Joseph,

and his sister, Ramona. The resulting warrant described the place to be searched:

The premises at 412 Opper, Granville, Putnam County, Illinois 61326 which is a two-story partial brick, single family residence with a two-stall attached garage. The premises shall include all rooms, attic, garage space, and other parts therein of said residence and any outbuilding or shed on said premises.

The warrant allowed the agents to search the premises described and "any magnetic, optical or digital media … on said person or in said property," and to seize "in any format and medium, all originals, computer files, copies and negatives of child pornography." The agent who prepared the warrant application was aware that Dollie owned a Chevrolet Blazer and that Joseph owned a teal-colored truck. But the agent did not specifically list those vehicles in the warrant application.

At approximately 6:05 a.m. on November 15, 2012, thirteen law enforcement agents executed the search warrant at the home where Borostowski lived with his parents and sister. Additional officers from local law enforcement assisted in traffic and perimeter security but did not enter the house. The initial "entry team" was comprised of seven agents. One agent carried a ballistic shield and all seven agents were armed with handguns. The entry team encountered Borostowski's sister, Ramona, on the front porch. The lead agent identified himself and asked Ramona who was in the house. Ramona told the agent that her brother and parents were asleep inside the house. An agent remained with Ramona during the execution of the warrant, preventing her, for a time, from leaving the

premises. Agent Matthew Hoffman knocked on the door and announced "FBI search warrant." Borostowski, who had been sleeping on the living room couch, answered the door. Agent Hoffman directed Borostowski to place his hands on his head. Agent Hoffman then pulled him by the arm out of the house and handed him off to Agent Jason Nixon. Agent Nixon took Borostowski by the arm, escorted him onto the lawn and handcuffed him. A barefoot Borostowski, who was wearing only sweatpants and a t-shirt, was forced to remain outside for twenty to twenty-five minutes in roughly forty degree temperatures while the entry team secured the home. Agent Nixon testified that he stood next to Borostowski as they waited, keeping his hand on Borostowski's handcuffs most of the time. At some point, Borostowski was allowed to move off of the wet grass onto the driveway, and some time after that, Agent Nixon moved his handcuffs from the back to the front so that Borostowski could sit near the front door of the house. While they waited outside, Agent Nixon searched Borostowski.

Ramona later testified that when her brother was led out of the house, he yelled out to her to get him an attorney. All of the agents who testified stated that they did not hear Borostowski make this request of his sister, including the agent who led Borostowski into the yard in handcuffs. Yet the district court apparently credited Ramona's testimony, finding that Borostowski's request to his sister demonstrated that "he was not a meek individual likely to be pushed around or feel threatened."

In the meantime, the entry team secured the home. An agent found Joseph sleeping in a downstairs room and required him to remain in place. Another agent encountered

Dollie coming out of her room upstairs in her pajamas. That agent brought Dollie downstairs and placed her apart from her husband in order to question Borostowski's parents separately. At some point, another sister approached the house and was prevented from entering by agents outside the home.

After the home was secured, Agents Nixon and Gregory Spencer brought Borostowski back into the home and led him up to Ramona's bedroom on the second floor. Once there, they removed his handcuffs. The bedroom, which was approximately 13'6" by 9'9", contained a double- or queen-sized bed, a dresser and a nightstand. Borostowski sat on a corner of the bed. Agent Nixon alternated between standing and sitting on the floor. Agent Spencer stood between Borostowski and the door. The room was small enough and crowded enough that the agents were within arms' reach of Borostowski at all times. Agent Spencer testified that the door was open most of the time. Agent Nixon testified that it was closed. The district court did not resolve the inconsistency. Although the agents were armed, their weapons were holstered at that point. For the next three hours, as eleven other law enforcement personnel searched the home and questioned Borostowski's parents and sister, Agents Spencer and Nixon interrogated Borostowski in Ramona's bedroom.

Agent Spencer took the primary role in the interrogation. The agents introduced themselves, showed Borostowski their credentials and told him they were at the home to execute a search warrant. Agent Spencer told Borostowski that they were searching for electronic media, that he was not under arrest, and that they wished to ask him questions about his activities and items from the house. Using a standard form, Agent

Spencer then read Borostowski his *Miranda* rights and asked if he understood them. Borostowski indicated that he did understand. Agent Spencer then read the consent portion of the form to Borostowski and asked if he was willing to answer questions. Borostowski replied that he wanted to cooperate and added, "But I think I should have an attorney present." Agent Spencer told Borostowski that he was "a bit unclear of exactly what you mean and what you want," and suggested that they discuss this further. Borostowski then told the agent that he was "torn and conflicted," that he wanted to cooperate but that he was also concerned that what he said would be used against him. Agent Spencer asked if Borostowski had an attorney in mind and he replied that he did not. Agent Spencer asked who had represented Borostowski when he was previously prosecuted for child pornography offenses. Borostowski then named Assistant Federal Public Defender Robert Alvarado, and explained that he had pled guilty in that case and had served time in prison. The agents did not stop the questioning at that time and did not contact Attorney Alvarado because, as Agent Nixon candidly acknowledged, they wanted to continue the interview without a lawyer present. Instead, Agent Spencer told Borostowski:

> One of the things you can do, I said, is you can start answering questions now. If you choose not to answer a certain question, you can say I don't want to answer that question. You can stop answering questions at any time during the interview, and, you know, if you choose during the interview to have an attorney, you can do that also.

Tr. at 196. Agent Spencer also told Borostowski that he understood his concerns, that he had "some things [he] had to show him to clear up," and that he would like Borostowski's cooperation. At that, Borostowski agreed to be interviewed and signed the consent portion of the *Miranda* form. From the introductions to the signing of the consent form, approximately fourteen minutes had elapsed.

For the next two hours, the questioning proceeded uninterrupted and in a conversational tone. During that time, Borostowski said numerous incriminating things. He told the agents that he owned an external hard drive but claimed to have lost it, and that he had a thumb drive as well. He admitted to trading child pornography over the internet. He identified pictures and chat sessions and commented on them as the agents made a list. At some point, he asked to use the bathroom. Agent Nixon escorted him down the hallway to the bathroom and then waited outside the door with two other agents until Borostowski was finished. Agent Nixon then escorted him back to Ramona's bedroom. At approximately 8:00 a.m., Agents Nixon and Spencer gave Borostowski a form titled "Written Statement" and asked him if he would fill it out. The form contained questions about child pornography and computer-related issues. Borostowski began to fill out the form and sometimes paused to ask a clarifying question before resuming.

While the questioning progressed, the agents searching the house were unable to locate the hard drive that Borostowski

mentioned in his emails. Agent Amanda Hoffman[1] decided to ask Dollie about the hard drive. Dollie did not know what a hard drive was or what one looked like. The agent described the device to Dollie, who indicated that she had seen something like that in her car, the Chevrolet Blazer parked in the driveway. Dollie confirmed that Borostowski had used her car for "quite a while." Agent Amanda Hoffman explained to Dollie that they were searching for evidence of child pornography, and she asked if Dollie would consent to a search of the Blazer for items that might contain child pornography. Dollie agreed to allow the search and signed a consent form. An agent then searched the Blazer and recovered a hard drive from the center console area. The hard drive was brought into the house where a forensic examiner briefly searched the device to determine if it contained child pornography. After confirming that it did, the examiner handed off the hard drive to Agent Spencer, who had taken a break from questioning Borostowski.

At approximately 8:30 a.m., Agent Spencer returned to Ramona's bedroom and wordlessly showed the hard drive to Borostowski. Borostowski looked at it for a few seconds and then told the agents that he had found it on the road. Agent Spencer challenged this story, reminding Borostowski that he had earlier denied owning a hard drive and pointing out that there were no scratches or marks on the drive as would be expected for an object found on the road. Borostowski then indicated that he found the drive in a Walmart parking lot.

---

[1] There were two agents with the surname "Hoffman" on the scene. We will refer to Agent Matthew Hoffman as "Agent Hoffman," and to Agent Amanda Hoffman by her full name.

Agent Spencer asked if videos from Walmart would show him purchasing the hard drive at Walmart. At first, Borostowski conceded that they would show him making the purchase but then clarified that videos would simply show him in the Walmart parking lot with the drive. When Agent Spencer said, "I don't believe your story. You know, I believe you purchased this," Borostowski replied, "I probably should have an attorney."

Agent Spencer considered this statement equivocal based on the use of the word "probably" and the context in which the statement was made. So instead of halting the interview and alerting Attorney Alvarado, the agents continued the questioning. Agent Spencer again sought to "clarify" Borostowski's request, inviting Borostowski to discuss what he meant. Agent Spencer reminded Borostowski that they had discussed attorneys earlier, that Borostowski had been cooperating throughout the interview, that the agents had previously been unclear on Borostowski's intentions at the earlier mention of an attorney and that the agents needed to clarify what Borostowski wanted before they proceeded. Agent Spencer then asked directly, "Do you agree to go on at this point and answer questions without an attorney?" Borostowski said, "Yes," and then admitted having purchased the hard drive at Walmart. He also admitted that the drive contained child pornography and that he stored it there in order to keep it off of his laptop computer. The questioning continued for approximately a half hour past that point.

As the agents were concluding the questioning, they asked Borostowski for the "Written Statement" he had been filling out during the questioning. Borostowski said he was going to

stop filling it out and wanted to keep it. He placed it in a file folder and set it aside, declining to give it to the agents.[2] Agent Spencer also asked Borostowski if he was willing to submit to a polygraph examination and Borostowski agreed to do so. The agents explained that the equipment and polygraph examiner were in Peoria. Borostowski's home was in Granville, Illinois, approximately 52 miles away. The agents explained to Borostowski that they would transport him to the FBI office in Peoria in an FBI vehicle and that standard procedure required them to restrain occupants. Prior to leaving the house for Peoria, Borostowski asked if he could put on shoes and a jacket. The agents allowed him to do so. Two agents then restrained Borostowski by placing him in handcuffs and leg shackles before putting him in the FBI car. When Borostowski asked whether the agents would bring him home again, they were "non-committal" in answering him, telling him "[s]omething to the effect of we will make sure that you're not stranded or we will make sure that you will get where you need to go." Tr. at 126. The restraints were removed at the Peoria FBI office, and Borostowski was taken into an interview room for the polygraph examination where he remained "for a number of hours" behind a closed door with the polygraph examiner. Tr. at 128-29. After the examination, the agents provided Borostowski with lunch. Sometime after that, they received confirmation from the special agent in charge that they should arrest Borostowski. At that point, they told

---

[2]   Agent Amanda Hoffman later returned to the house and retrieved the partially completed form from Ramona's bedroom. At that time, Dollie also handed over a thumb drive that she found in the home.

Borostowski that he was under arrest, they again handcuffed and shackled him, and then transported him to jail.

Borostowski moved to suppress the statements he made to the agents who questioned him that day on the grounds that the agents violated his *Miranda* rights when they continued to question him after he twice (and perhaps three times) invoked his right to counsel. He also moved to suppress the hard drive found in his mother's car, contending that it was not within the scope of the search warrant and that his mother's consent to search the car did not extend to the contents of the hard drive. The district court denied both motions. The court found that Borostowski was not in custody during the questioning that occurred at his home, and thus was not entitled to the protections of *Miranda*. The court therefore declined to consider whether Borostowski's statements regarding an attorney were unequivocal invocations of his right to counsel. As for the hard drive, the court found that Dollie's car was within the scope of the warrant. The court also noted that the hard drive was admissible under the independent source doctrine because the agents sought and received a second warrant after seizing the hard drive, asking a magistrate to authorize a search of the contents. Borostowski then pled guilty but retained the right to appeal the court's rulings on the motions to suppress.

## II.

On appeal, Borostowski argues that the district court erred when it concluded that he was not in custody for Fifth Amendment purposes. He also contends that the court should have determined that the search of the external hard drive was not authorized by either of the search warrants issued in the case.

Finally, he maintains that the court relied on incorrect information in setting his sentence.

## A.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. *See also Stansbury v. California*, 511 U.S. 318, 322 (1994). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury*, 511 U.S. at 322. In this instance, it is undisputed that the officers gave Borostowski an appropriate *Miranda* warning before questioning him. But immediately after hearing that warning, Borostowski stated, "But I think I should have an attorney present." When an individual in custody "states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474; *United States v. Wysinger*, 683 F.3d 784. *See also United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) ("I think I should call my lawyer," "Can I talk to a lawyer?" and "Can I have a lawyer?" are all unequivocal invocations of the right to counsel requiring police officers to halt interrogations). The district court declined to consider whether Borostowski's statement was an unequivocal invocation of his right to counsel. Instead, the court concluded that Borostowski was not "in custody" for *Miranda* purposes and therefore had no right to have an attorney present during

questioning. It is that finding that Borostowski challenges on appeal.

We review the district court's findings of historical fact for clear error, but the ultimate "in custody" determination for *Miranda* purposes is a mixed question of law and fact qualifying for independent review. *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995); *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012); *United States v. Pillado*, 656 F.3d 754, 770 (7th Cir. 2011). *See also United States v. Slaight*, 620 F.3d 816, 821 (7th Cir. 2010) (appellate review of a judge's finding that an interrogation was not custodial is plenary). In determining whether a person is in custody, our first step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). *See also Stansbury*, 511 U.S. at 322-23 (the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned); *Thompson*, 516 U.S. at 112 ("in custody" analysis requires consideration of the circumstances surrounding the interrogation and whether, in light of those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave); *Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004) (custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances). Relevant factors include the location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the

release of the interviewee at the end of questioning. *Howes*, 132 S. Ct. at 1189. *See also Ambrose*, 668 F.3d at 956 (in determining whether a person is in custody, a court should consider, among other things, whether the encounter occurred in a public place, whether the suspect consented to speak with officers, whether the officers informed the suspect that he was not under arrest, whether the interviewee was moved to another area, whether there was a threatening presence of several officers and a display of weapons or physical force, whether the officers deprived the suspect of documents needed to depart and whether the officers' tone was such that their requests were likely to be obeyed).

The district court found that the agents arrived at Borostowski's home in a show of force. He was handcuffed and taken outside where an agent remained at his side for approximately twenty-five minutes. While still handcuffed, Borostowski was then led back into the home and taken to an upstairs bedroom by two armed federal agents. The district court determined that, during that time, Borostowski was "not free to leave." The court noted that Borostowski "may have felt confined" but he was in familiar surroundings in his own home, the handcuffs were removed once he was in Ramona's bedroom, he was told he was not under arrest or in custody, the questioning was never hostile or combative, and he had expressed a willingness to cooperate. Acknowledging that a suspect's subjective state of mind is irrelevant to the objective standard applied, the court nevertheless also noted that Borostowski had yelled to his sister to get him an attorney, leading the court to conclude that he was "not a meek individual likely to be pushed around or feel threatened." On balance,

the court concluded, Borostowski was not in custody. The court therefore declined to "address the issue of his requests for counsel."

We find no clear error in the court's findings of historical fact but the court's recitation of the circumstances surrounding the interrogation is incomplete. We glean a broader picture from the undisputed testimony of the government's own witnesses. We begin with whether there was a threatening presence of several officers and a display of force, and we accept the district court's finding that there was a show of force. The arrival of thirteen law enforcement officers in a single family home could hardly be described otherwise. No one disputes that additional officers outside the home provided traffic control and perimeter security. The initial entry team consisted of seven armed officers, including one carrying a ballistic shield. "Custody for Miranda purposes is a state of mind. When police create a situation in which a suspect reasonably does not believe that he is free to escape their clutches, he is in custody[.]" *Slaight*, 620 F.3d at 820. In *Slaight*, nine officers entered a house with a battering ram, found the defendant in bed and ordered him, in an authoritative tone, with guns pointed at him, to put his hands up. We characterized this as an "overwhelming armed force in the small house [that] could not have failed to intimidate the occupants." 620 F.3d at 820. In this case, of course, Borostowski opened the door when the officers knocked and so there was no forced entry here, but as in *Slaight*, a large number of armed officers roused Borostowski from where he slept, authoritatively ordered him to place his hands over his head and then physically pulled him from the house and restrained him. A total of

thirteen officers then entered the house for the search and questioning. They separated the home's other occupants and prevented family members from entering or leaving the home for a period of time. This overwhelming display of force inside a single family home would have led a reasonable person to believe that he was not free to leave. *See also United States v. Mittel-Carey*, 493 F.3d 36, 38-40 (1st Cir. 2007) (finding that the presence of eight officers in the home would contribute to a finding that a person was in custody); *United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008) (finding that the presence of eight officers from three different law enforcement agencies in a suspect's home would lead a reasonable person to feel that his home was dominated by law enforcement agents).

The next factor is the presence or absence of physical restraints. On encountering Borostowski at the door of the home, the agents took him by the arm and pulled him out of the house. Agent Nixon then handcuffed him and held him in the front yard for approximately twenty-five minutes, keeping a hand on the handcuffs. Two agents then led a still-handcuffed Borostowski back into the house to a bedroom on the second floor. Once there, the handcuffs were removed but an armed federal agent stood between Borostowski and the door. Borostowski remained within arm's reach of the agents for the next three hours as they questioned him. He was not allowed to leave the bedroom and walk through his own home unaccompanied but was followed to the nearby bathroom and had to ask for shoes and a jacket before the agents shackled his hands and legs and drove him to FBI headquarters for polygraph testing. The use of restraints for twenty-five minutes,

followed by confinement in a small room with an armed officer blocking the door for the next three hours, followed by the use of handcuffs and leg shackles would lead a reasonable person to believe that he was not free to leave. *Howes*, 132 S. Ct. at 1189 (noting that the use of restraints contributes to a suspect's sense that his freedom of movement has been restrained). Similarly, the accompaniment by officers as Borostowski moved through his own home would lead a reasonable person to believe that he was in custody. *Mittel-Carey*, 493 F.3d at 40 (noting that accompanying the defendant to the bathroom in his own home indicated a level of control exercised by the officers that favored a finding of custody).

The district court did not resolve the dispute over whether the door to the small, crowded bedroom was open or closed during the three hour interrogation. One agent testified that it was kept open; the other testified that it was closed most of the time. The government seeks the benefit of both officers' testimony, arguing that Borostowski could not have felt confined with an open door and also that he could not have been intimidated by the eleven other officers roaming the house because he would not have been aware of them behind the closed door. One way or the other, though, these circumstances weigh in favor of finding that Borostowski was in custody: either the door was open and Borostowski was thus aware of the large number of officers moving through the house, or the door was closed and he was confined to a small, crowded room with two armed agents, one of whom blocked a closed door. In either case, a reasonable person would not have felt free to leave.

Turning to the remaining factors, it cannot be said that Borostowski voluntarily agreed to meet with law enforcement agents. *Yarborough*, 541 U.S. at 661 (where defendant came voluntarily to the police station, was immediately informed that he was not under arrest, was interviewed for half an hour and then left the police station without hindrance, it is clear that he was not in custody or otherwise deprived of his freedom of action in any significant way); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (defendant's voluntary initiation of communication with police weighs against a finding of custody); *Ambrose*, 668 F.3d at 956 (procuring a suspect's presence at an interview through the use of a ruse weighs against voluntariness and in favor of finding that he was in custody). Although Borostowski was voluntarily in his home when the agents arrived, he was then removed from the home, handcuffed and marched to the interview room still in hand-cuffs. The encounter could not reasonably be described as voluntary, nor would a reasonable person have experienced it as voluntary.

Nor was Borostowski released at the end of the lengthy encounter. *Howes*, 132 S. Ct. at 1189; *Beheler*, 463 U.S. at 1122-23. In fact, his interaction with the agents became more and more restrictive as the day went on, culminating in his formal arrest at FBI headquarters. The day began with handcuffs, continued with a constant personal guard of one or two agents, moved into a small room where an agent stood between Borostowski and the door, proceeded to handcuffs and leg shackles on a trip to FBI headquarters, and ended with formal arrest, again with handcuffs and leg shackles. The at-home portion of the interview lasted approximately two and a half or three hours

but then continued with a polygraph examination that was described by one agent as lasting hours. The extended duration of the encounter also weighs in favor of a finding of custody. *Howes*, 132 S. Ct. at 1189. Moreover, once the external hard drive was discovered, the tone of the questioning changed, with Agent Spencer telling Borostowski that he did not believe Borostowski's story about finding the hard drive on the road or in a parking lot. A reasonable person in Borostowski's circumstances would not have felt free to end the interview and leave at any stage of the proceedings.

Weighed against the strong police presence, the use of handcuffs and a *de facto* two-man guard as restraints, the extended length of the interrogation, the confinement to a small crowded room, as well as the other factors we have noted, there are two facts favoring a finding that Borostowski was not in custody. First, Borostowski was told that he was not under arrest or in custody. Second, the tone of the questioning never became hostile or combative. Generally, those facts would support a finding that a reasonable person would feel free to leave. But when combined with the other circumstances, these factors are not determinative. "[B]eing polite to a suspect questioned in a police station and telling him repeatedly that he's free to end the questioning and leave do not create a safe harbor for police who would prefer to give *Miranda* warnings after the suspect has confessed rather than before." *Slaight*, 620 F.3d at 821. *See also United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008) (the mere recitation of the statement that the suspect is free to leave or terminate the interview does not render an interrogation non-custodial *per se*, but the court must consider the delivery of these statements within the context of

the scene as a whole); *United States v. Colonna*, 511 F.3d 431, 435-36 (4th Cir. 2007) (the mere utterance of the words "you are not under arrest" does not end the "in custody" analysis but rather the words must be taken in the larger context of the totality of the circumstances).

As for the setting, Borostowski was in familiar surroundings, in his sister's bedroom, in his parents' home. That fact generally weighs in favor of finding that he was not in custody. But he was forcefully separated from family members, and although he was in his own home, he was not allowed to move through the house without one or more agents at his side, and was handcuffed when he was first led back into the house. *Orozco v. Texas*, 394 U.S. 324, 325-27, 330 (1969) (finding custody where four officers entered the suspect's bedroom and behaved as though he was "not free to go where he pleased but was under arrest" even though they did not actually handcuff or physically subdue the suspect, and even though he was in familiar surroundings and the interrogation was not prolonged); *Sprosty v. Buchler*, 79 F.3d 635, 641-42 (7th Cir. 1996) (more important than the familiarity of the surroundings where the suspect was being held is the degree to which the police dominated the scene). *See also Craighead*, 539 F.3d at 1085 (when law enforcement agents restrain the ability of a suspect to move with physical restraints or through threats or intimidation, a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation); *Mittel-Carey*, 493 F.3d at 40 (where agents told the defendant where to sit within his own home, physically separated him from his girlfriend, escorted him on the three occasions when he was permitted to move, including

during a trip to the bathroom, the level of physical control the agents exercised over the defendant weighed heavily in favor of finding custody, despite the fact that the control was exercised inside defendant's home).

On balance, we cannot agree with the district court that a reasonable person in these circumstances would have felt free to end the encounter and leave at any point throughout the day. We vacate the court's finding and remand so that the court may consider in the first instance whether and when Borostowski unequivocally invoked his right to counsel. If the court concludes that Borostowski did invoke his right to counsel, then any statements that Borostowski made from that point forward would be excluded from trial.

**B.**

Borostowski also challenges the district court's ruling that the seizure of the external hard drive recovered from his mother's car and the subsequent search of the contents were authorized under the Fourth Amendment. In considering a district court's decision on a motion to suppress, we review findings of fact for clear error and questions of law *de novo*. *United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014); *Wysinger*, 683 F.3d at 793; *United States v. Garcia–Garcia*, 633 F.3d 608, 612 (7th Cir. 2011).

There are no real disputes abut the facts. As Borostowski concedes, the agents here obtained a warrant to search Borostowski's person, the premises at Opper Avenue, his 1993 red Chevrolet pickup truck, and any magnetic, optical or digital media "on said person or in said premises." After the agents initially failed to find the hard drive in the house, Agent

Amanda Hoffman questioned Dollie, who indicated she had seen an object in her car matching the agent's description of the device. Dollie's car was not listed in the warrant and so the agent then asked for and received consent from Dollie to search her Chevrolet Blazer, which was parked on the premises, in the home's driveway. The hard drive was discovered in the front console area of Dollie's car. The agents then conducted a preview search of the hard drive to determine whether it contained child pornography, and they discovered an extensive collection on the device.

In assessing the lawfulness of this search, the district court noted that Dollie consented to the search of the Blazer, that the Blazer was parked on the premises, and that the warrant authorized a search of the premises, including any and all containers that might contain digital media. Citing our opinion in *United States v. Percival*, 756 F.2d 600, 612 (7th Cir. 1985), the court noted that a warrant which authorizes the search of a premises may permit the search of vehicles owned or controlled by the owner of the property which are located on the property. In *Percival*, the court reasoned, we found lawful a search of a vehicle parked in an attached garage even though the warrant authorized only a search of the house and attached garage. The district court concluded that, under *Percival*, the Blazer came within the scope of the warrant and the search of the hard drive was therefore lawful. In the alternative, the court noted that the government sought a second warrant for the contents of the hard drive after conducting the preview search that revealed the device contained child pornography. The court found that, under the independent source doctrine,

the second warrant, untainted by the original search, authorized the search of the contents of the hard drive.

On appeal, Borostowski contends that because the Blazer was not listed in the warrant, and because Dollie had no authority to consent to a search of the contents of the hard drive, that search was unreasonable under the Fourth Amendment. He also objects to the court's application of the independent source doctrine. We conclude that the search of the hard drive was lawful based on the combination of the first warrant and Dollie's consent to search the Blazer. We find no need to extend the reasoning of *Percival* to the facts here and we also decline to address the application of the independent source doctrine in these circumstances.

The agents included in the first warrant application the entire premises where Borostowski lived. The warrant authorized a search not only of the premises but also of the contents of any electronic media found on the premises. Dollie's car, which was not included in the warrant, was essentially a closed container on the premises; the agents knew that the Chevrolet Blazer belonged to someone other than the target of the warrant and, initially, they had no reason to connect it to any criminal activity. Under the Fourth Amendment, "a search conducted without a warrant issued upon probable cause is '*per se* unreasonable … subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth*, 389 U.S. at 219;

*Davis v. United States*, 328 U.S. 582, 593-94 (1946). Thus, even though the Blazer was not included in the first warrant, Dollie's consent authorized the agents to open that "closed container" of the car and retrieve the hard drive. Because of Dollie's consent, there is no need to expand our reasoning under *Percival* to extend the scope of the warrant to a vehicle on the property that was not listed in the warrant, especially where that vehicle initially bore no known relationship to the target of the warrant or to any criminality.

As for the contents of the hard drive, having lawfully recovered the device from a closed container (*i.e.* the car) on the premises, the agents were authorized by the first warrant to search the contents of the hard drive. The warrant distinguishes this case from *United States v. Basinski*, 226 F.3d 829 (7th Cir. 2000). Borostowski relies on *Basinski* for the proposition that his mother had no actual or apparent authority to consent to the search of the contents of the hard drive. In *Basinski*, police officers wished to search the contents of a locked briefcase which the defendant had left in the custody of a friend. The friend voluntarily handed the briefcase over to police officers who lacked a warrant and who knew that the friend was not authorized to allow a search of the case. We held that the warrantless search of the briefcase was unlawful where the friend lacked actual authority to consent to a search of the case and where the officers had no reasonable belief that the friend possessed any authority to consent to the search. 226 F.3d at 834-36. In this case, though, the agents had a warrant that specifically allowed them to search the contents of electronic media found on the premises. Dollie's consent opened only the door to the car; her permission was not

necessary for the search of the contents of the device because the warrant allowed that examination.

If Dollie's car had not been parked on the premises, we might be faced with a different analysis of whether the hard drive's contents were within the scope of the first warrant. But the circumstances here are no different than if Borostowski had hidden the hard drive in his mother's locked jewelry box in her bedroom within the house, for example, and his mother consented to a search of her jewelry box. Borostowski could have no serious claim that a hard drive found in the jewelry box would have been beyond the scope of the warrant. Nor could he have claimed that the agents could not search a hard drive that had simply been found sitting on the driveway, which was clearly part of the premises. That the closed container in which the device was found was a car does not necessitate a special analysis. In *United States v. Evans*, 92 F.3d 540, 543 (7th Cir. 1996), we concluded that "a car parked in a garage is just another interior container, like a closet or a desk." When the police possessed a warrant to search a garage for drugs, we noted that the ownership of a car within the garage did not play into the lawfulness of the search of the car "unless it obviously belonged to someone wholly uninvolved in the criminal activities going on in the house." *Evans*, 92 F.3d at 543-44. Such was the case here where the agents knew that the car belonged to someone wholly uninvolved in the criminal activities going on in the house, namely Dollie. But Dollie's consent allowed the agents to open the car and the warrant allowed them to examine the contents of the device found within the car. In short, the car was on the premises, Dollie's consent allowed a search of the car, and the first warrant

allowed the search of any digital media discovered on the premises. The district court was therefore correct in declining to suppress the contents of the hard drive.

## C.

We turn finally to the sentencing issue raised by Borostowski. On appeal, Borostowski complains that the district court relied on incorrect information in setting his sentence. Because Borostowski did not object to the court's use of that information at the time of sentencing, we review the district court's decision for plain error only. *United States v. McLaughlin*, 760 F.3d 699, 706 (7th Cir. 2014). In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). An error is plain if it is clear or obvious. *Olano*, 507 U.S. at 734. "An error 'affects the defendant's substantial rights' when it is prejudicial, that is, when it has affected the outcome of the district court proceedings." *United States v. Aslan*, 644 F.3d 526, 540–41 (7th Cir. 2011) (quoting *Olano*, 507 U.S. at 734). The government agrees that a defendant possesses a due process right to be sentenced on the basis of accurate information. *Gall v. United States*, 552 U.S. 38, 51 (2007).

In analyzing the section 3553(a) factors, the court remarked that none of the factors could be applied favorably to Borostowski:

> Not only did Mr. Borostowski violate children, he violated those that placed their trust in him. You look at the comments to Exhibit 1, teddy bear said, I would love to see her, a lot more of her, and Mr.

> Borostowski's response was, working on it. So I guess in addition to exploiting children and including – which includes your [minor female relative], Mr. Borostowski was willing, or at least indicated a willingness to pimp or prostitute her out as well.

R. 49, Tr. at 27. Borostowski objects that there was no evidence in the record supporting the court's conclusion that he was willing to "prostitute" the child or sell her sexual services to anyone. He contends that the court thus relied on inaccurate information in setting his sentence.

In context, however, the court's comments do not indicate plain error in sentencing Borostowski. The government presented as an exhibit at sentencing a sexually suggestive photograph of a fully-clothed minor female relative that Borostowski took and posted on the internet. As the court's remarks indicate, when a commenter on the website said that he would like to see more of the child, Borostowski replied that he was "working on it." In context, the court was using the words "prostitute" and "pimp" as synonyms for "exploit." Moreover, the focus of the court's concern about this picture and the posted comments was that Borostowski's actions now involved not only strangers but the exploitation of a child and family member who trusted him. The substance of that remark was true: Borostowski had indeed taken and posted a sexually suggestive picture of a family member, a child. We find no error in the court's characterization of that photograph and the accompanying comments where it is clear in context that the court was referring not to literal prostitution but rather to sexual exploitation through photographs shared on the internet.

## III.

In sum, we reverse and remand for further proceedings the district court's finding that Borostowski was not in custody during his interrogation. On remand, the court must determine whether and when Borostowski invoked his right to counsel and the court must suppress any statements Borostowski made after any invocation of the right to counsel. We affirm the court's decision denying the motion to suppress the contents of the hard drive retrieved from Dollie's car. And finally, we find no plain error in the procedure the district court used in sentencing Borostowski.

REVERSED AND REMANDED IN PART;

AFFIRMED IN PART.