# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 156

OCTOBER TERM, A.D. 2022

*December 13, 2022*

MARIO M. MILLS,

Appellant
(Defendant),

v.

S-21-0232

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Fremont County*
*The Honorable Jason M. Conder, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames*, Senior Assistant Attorney General; Rachel Edelman, Student Intern. Argument by Ms. Edelman.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

*\*An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    Mario M. Mills was convicted of second-degree murder in the shooting death of his friend, Trevor Bartlett. On appeal, he claims the district court erred in denying his motion to suppress his statement to law enforcement. We reverse in part, affirm in part, and remand.

## *ISSUES*

[¶2]    We restate the issues on appeal as follows:

1. Did the district court correctly conclude that Mr. Mills was not in custody during his police station interview until such time as law enforcement took his cell phone, declined his request to speak to his wife, and directed him to remain in an interview room?

2. Was the district court's error in determining when Mr. Mills' interrogation became custodial harmless?

3. Does the record support the district court's conclusion that Mr. Mills' statement to law enforcement was voluntary?

## *FACTS*

[¶3]    On the evening of March 25, 2020, Mario M. Mills and his wife, Courtnie Mills, spent time in the garage of their Riverton, Wyoming home, drinking and playing cribbage with Trevor Bartlett, a longtime friend of Mr. Mills. Ms. Mills went to bed, and Mr. Mills and Mr. Bartlett remained in the garage drinking and talking. Their conversation turned to Mr. Bartlett's desire to kill himself, something he had threatened on numerous past occasions, and they argued about it. At one point, Mr. Mills handed Mr. Bartlett a gun from his workbench and said, "If you are going to do it, just do it." Mr. Mills then wrestled the gun away from Mr. Bartlett and returned it to the workbench.

[¶4]    The two men continued to drink and talk, and the conversation again turned to Mr. Bartlett's desire to commit suicide and to take others with him. He told Mr. Mills he had over a hundred rounds of ammunition and a list of people he wanted to shoot, and he would not give up until someone took him out. He then asked Mr. Mills to kill him, and they continued arguing. Mr. Mills finally asked Mr. Bartlett if he was sure that was what he wanted. When Mr. Bartlett said yes, Mr. Mills retrieved the gun from the workbench and shot him in the head.

1

[¶5]    By this time, it was approximately 1:30 in the morning. Mr. Mills woke his wife and told her what he had done, and she checked on Mr. Bartlett and confirmed he was dead. Ms. Mills wanted to call the police, but Mr. Mills persuaded her to wait. The two returned to the garage where Mr. Mills put on latex gloves, picked up the pistol from the garage floor, put it in Mr. Bartlett's hand, and then unloaded it and placed it on a workbench. The Mills then left the garage and went upstairs to their bedroom, where they disrobed and placed their clothing and the latex gloves in a plastic garbage bag, which they hid under the bed.

[¶6]    Later that morning, at approximately 5:00, Ms. Mills called 911 and reported that she had just discovered Mr. Bartlett dead in her garage and believed he had shot himself. Officers from the Riverton Police Department responded to the scene, and Detective James Donahue arrived a little after 6:00 a.m. He interviewed both the Mills, and they each gave the same version of events Ms. Mills had given when she called 911. Mr. Mills also reported that he had found the gun on the garage's concrete floor, about three feet from Mr. Bartlett's body.

[¶7]    After examining the scene, Detective Donahue concluded it was unlikely Mr. Bartlett shot himself. The stippling around the wound was spread out, and not concentrated near the wound, indicating the gun had been fired from greater than six inches away. He also observed that the gun had no blood spatter or blowback, which was inconsistent with the blood spatter pattern found on other items near the wound. He had also learned that Mr. Bartlett was right-handed, yet the wound was on the left side of his head. Finally, he noted that there were no impact marks on the gun, which he would have expected had it fallen from Mr. Bartlett's hand and hit the concrete floor three feet from his body.

[¶8]    Detective Donahue left the Mills' home between 8:30 and 8:45 that morning, but before leaving he asked the Mills if they would be willing to come to the police department to discuss the events of the prior evening. They agreed, and he asked when would be convenient for them. They said they would be there by 10:00 that morning. After law enforcement left their home, the Mills drove to Ms. Mills' place of employment and discarded the bag that contained their clothing and the latex gloves.

[¶9]    At approximately 9:45 a.m., the Mills arrived at the Riverton Police Department, along with Mr. Mills' minor daughter, MM. After entering the City Hall building through its front entrance, they were admitted through a secure access door into the police department lobby. The access door was locked from the outside but could be pushed open from the interior. They were offered water, and they waited in the lobby where they had access to City Hall, the restroom, and the parking lot.

[¶10]   After about five to ten minutes, Detective Donahue began his separate interviews of the Mills. He first interviewed MM. Detective Donahue testified at the suppression hearing:

Q.      Okay. Did she tell you – did she tell you that somebody in her house had killed Trevor Bartlet[t]?

A.      She described waking up a little after 1:00 a.m. on the 26th to sounds of her mother and father, Courtnie and Mario, upset, and hearing a description of Trevor being dead in their garage. She thought that this was pretty odd. It was also very disturbing to her. She had a very difficult time going back to sleep.

Q.      Did she tell you that Mr. Mills had shot Trevor Bartlet[t]?

A.      No.

Q.      Did she tell you Courtnie Mills had shot Trevor Bartlet[t]?

A.      No.

[¶11]   After interviewing MM, Detective Donahue asked if she would be willing to wait in an activity room where the department kept games, coloring items, and snacks, and she agreed. He next interviewed Ms. Mills, who initially gave the suicide story she originally reported. At some point in the interview that changed.

Q.      What is – generally what does she tell you?

A.      Generally she describes being woken up by Mario Mills a little after 1:00 in the morning on the 26th. She describes him telling her that he had shot Trevor and Trevor was dead in the garage.
        She describes going down the stairs in a panic, going into the garage. She is a nurse, and she describes being able to recognize when someone is deceased, and checking his pulse and finding that Trevor is, in fact, dead. She describes coming back into the house and talking with Mario Mills on the stairwell.

[¶12]   Ms. Mills told Detective Donahue that she tried to call 911, but Mr. Mills asked her not to because he did not want to go to jail. She also told him they returned to the garage, and she described the steps they took to conceal the crime and make Mr. Bartlett's death look like a suicide, and how they disposed of the clothing they had worn. After completing

3

her interview, Detective Donahue asked if she would like to join MM or go somewhere else, and she chose to wait with MM.

[¶13] About five minutes after Detective Donahue completed his interview of Ms. Mills, Mr. Mills was led to an interview room and patted down by another detective. Mr. Mills entered the interview room followed by Detective Donahue, and Detective Donahue closed the door. All subsequent events were recorded via audio and video (consisting of five video recordings).

[¶14] The district court accurately described the interview room as follows:

> Th[e] room appears to be the size of a medium or small office and is shaped like an octagon that has been cut in half. The floor is carpeted, the walls are painted in a light color, and there is a medium sized wipe board (with no writing on it) hanging on the wall. There are no other wall hangings and no windows visible on the video, yet, there is a microphone hanging down from the ceiling. It appears there is only one door to this room, however, it is not visible on the video. Overall, there are five pieces of furniture in the room visible on the recording. There is a small couch at the end of the room opposite the camera view. There is a medium-sized, rectangular shaped folding banquet type table placed next to the wall near the middle of the room, and on each side of the table (lengthwise) there are two plain chairs, with another chair placed against the wall near the door.

[¶15] After entering the room, Mr. Mills took a seat at the end of the table farthest from the door, and Detective Donahue sat at the other end, about three to four feet from him. Mr. Mills was not in handcuffs or restrained in any manner, and he had been permitted to keep his cell phone. Detective Donahue was in plain clothes and was the only detective or officer in the room. He was soft-spoken and remained so throughout the interview.

[¶16] Detective Donahue started his interview of Mr. Mills at 12:08 p.m. and told him at the outset that he was not under arrest. He also informed him they were being recorded by both audio and video and pointed to those devices. He began by complimenting Mr. Mills on the raising of his daughter and commending him for his military service. About a minute and a half into the interview, he told Mr. Mills that he had spoken to MM and Ms. Mills, and Mr. Mills nodded. He then told him, "We're in the business of truth," and stressed the importance that, as a man, he be honest even if he was afraid. He then asked Mr. Mills what happened.

4

[¶17]  For the next twelve to thirteen minutes, Mr. Mills described his relationship and history with Mr. Bartlett and repeated certain elements of his original version of events. Detective Donahue then asked, "So what happened last night?" Mr. Mills then described some things that he and Mr. Bartlett argued about and said it concluded with them muttering things to each other as he left and went to bed.

[¶18]  At that point, Detective Donahue said, "I know what you told us this morning and what you're telling me now. There're some things that don't exactly make sense with what you are saying." He then told Mr. Mills, "We need to be in the business of truth." When Mr. Mills tried to respond, Detective Donahue stopped him, and said, "Hear me out." Detective Donahue stated he understood that when people drink, "crazy sh** happens." He told Mr. Mills this was his opportunity to talk through the "crazy sh**" and tell the truth. He then told him that based on their crime scene tools and training, they have a pretty good idea of what took place. Detective Donahue told Mr. Mills he understood his fear and concern, but that his purpose was not to ruin Mr. Mills' life, disrupt his family, or upend his work, but instead to provide an opportunity for him to free his mind and heart and talk about what happened.

[¶19]  Detective Donahue again asked what happened. When Mr. Mills said he was telling him what he knew and that he did not know about the discrepancies, Detective Donahue interrupted him and asked, "Can I tell you some things I know?" He then told Mr. Mills that he knew that around 1:00 that morning, Mr. Mills had a specific conversation with his wife, and he knew the nature of the conversation and the details. He told him that he also knew that MM overheard the conversation. And he told him he knew the idea that Mr. Mills did not know what happened is inaccurate, and he was hoping Mr. Mills would take this opportunity to tell him what happened from his perspective.

[¶20]  Mr. Mills responded that he could not remember, and Detective Donahue told him he knew he could remember certain things, and he needed to remember as much as he could so he could try to help Mr. Mills move forward. Detective Donahue told Mr. Mills to tell him about the argument and what happened with the gun, and he said he knew accidents can happen and things can get out of control. He then added that he knew about Mr. Mills' clothes, and he wanted to hear his side so he could help.

[¶21]  When Mr. Mills continued to equivocate and report a lack of memory, Detective Donahue told Mr. Mills that he knew he went in the house and talked to Ms. Mills, there was a physical altercation between him and Mr. Bartlett, and something happened with the gun. Mr. Mills denied this and talked about the effects of alcohol on him. Toward the end of that discussion, Detective Donahue and Mr. Mills spoke over each other, and then Detective Donahue said there was more to this; whether Mr. Mills was intentionally blocking, he had some very specific conversations and did some specific things, and he (Detective Donahue) knew all about it. Mr. Mills responded, "Like what?" and Detective

Donahue said he did not want to spoon-feed him and that he wanted to give Mr. Mills the chance to be the man he was and tell the truth.

[¶22]  At this point, Mr. Mills said he was getting the feeling that the detective was accusing him of killing Trevor, and Detective Donahue asked, "Why would you think that's the case?" Mr. Mills responded that the detective was telling him to come clean. Detective Donahue asked at what point Trevor was shot, and Mr. Mills again responded that he did not remember. Detective Donahue then said that this was very important because "we both know . . . you didn't just go upstairs and go to bed." He told Mr. Mills that Courtnie wanted to call the police and she did not because of their conversation and because she wanted to find a way to make it better.

[¶23]  Mr. Mills then said, "So you're saying I shot Trevor." Detective Donahue responded, "I'm asking you." Mr. Mills' breathing became labored, and Detective Donahue said, "I want to help you out." He asked Mr. Mills to tell him about his conversation with Courtnie, and as Mr. Mills continued to hyperventilate, Detective Donahue added, "Right now, you're seeing what happened." Mr. Mills then said, "Oh sh**, I shot Trevor." Detective Donahue responded by asking how he shot Trevor. Mr. Mills continued to hyperventilate, and Detective Donahue said, "It's coming back to you," and "So what happened."

[¶24]  Mr. Mills described what happened. He said that Trevor told him he had over a hundred rounds of ammunition and a specific list of people he was going to shoot. He and Trevor discussed those plans for a bit, and Mr. Mills told him, "You can't do that Trevor." Mr. Mills told Trevor to just do it if he wanted to kill himself. Trevor said he could not do it himself and told Mr. Mills to be a true friend and do it for him so he would not hurt other people. Mr. Mills said he grabbed his gun, and Trevor took a shot of alcohol and said do it. Mr. Mills asked if he was sure and said, "Don't make me do this." Trevor told him to do it and say it was a suicide. Mr. Mills then shot him.

[¶25]  Mr. Mills told Detective Donahue that after he shot Mr. Bartlett, he panicked and told his wife. He admitted that she wanted to call the police, and he asked her to wait because he did not want to go to jail. He then said to Detective Donahue, "Oh my god, oh my god, what do I do," and he asked about a possible defense. Detective Donahue told him he could not worry about that right then and that his honesty was the best thing that could help him. He then confirmed with Mr. Mills that he held the gun in his right hand when he shot Mr. Bartlett, that he shot him on the left side while Mr. Bartlett was sitting in a chair, and that he then set the gun on the floor.

[¶26]  Shortly after these statements, Detective Donahue indicated they were taking a break, and he asked Mr. Mills to hang out. Mr. Mills handed Detective Donahue his cell phone and asked him to give it to Ms. Mills. Detective Donahue asked if he could retain the phone, and Mr. Mills said no because Ms. Mills needed it, and he asked if he could

speak with Ms. Mills. Detective Donahue said not at that time. Mr. Mills then asked, "Am I under arrest? When I walked in here was that the last I was going to see anything outside?" Detective Donahue responded, "I don't think so." Mr. Mills continued to express concerns, and Detective Donahue told him he was going to step out and he wanted Mr. Mills to think about the details and get them clear in his mind and they would talk more.

[¶27]  After he returned, Detective Donahue continued to interview Mr. Mills. Shortly after 2:00 that afternoon, he placed him under arrest for the murder of Mr. Bartlett. Detective Donahue did not advise Mr. Mills of his *Miranda* rights at any time during his interview or upon his arrest.[1]

[¶28]  The State charged Mr. Mills with one count of first-degree murder. Before trial, Mr. Mills moved to suppress his statement to Detective Donahue on grounds that 1) the interview was a custodial interrogation and Detective Donahue did not advise him of his *Miranda* rights; and 2) his statements were not voluntary.[2]

[¶29]  As to the *Miranda* question, Mr. Mills contended he was in custody for the entire interview because Detective Donahue knew Mr. Mills had shot and killed Mr. Bartlett, and "[o]nce he walked in that room, he wasn't going to go anywhere." He also argued a reasonable person would not have felt free to leave once Detective Donahue confronted him with evidence of his guilt, and once he confessed to the shooting.

[¶30]  The State conceded Detective Donahue's interview of Mr. Mills was an interrogation. It contended, however, that it did not become custodial until Detective Donahue returned from his break in the interview and Mr. Mills reenacted the crime, approximately fifty-nine minutes into the interview. It argued that up to that point there was no way to know specifically what occurred, and there was "great jeopardy of placing somebody under arrest that had acted in a justified manner."

[¶31]  The district court rejected the positions of both Mr. Mills and the State. It concluded that Mr. Mills was in custody earlier than the State argued but not as early as Mr. Mills claimed.

---

[1] "The phrase '*Miranda* warning' refers to the right to be advised of the constitutional rights to remain silent and have counsel before being subjected to a custodial interrogation." *Bittleston v. State*, 2019 WY 64, ¶ 30 n.7, 442 P.3d 1287, 1295 n.7 (Wyo. 2019) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *see also Tate v. State*, 2016 WY 102, ¶ 18, 382 P.3d 762, 766-67 (Wyo. 2016) ("These warnings (which have come to be known colloquially as '*Miranda* rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'") (quoting *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405 (2000)).

[2] Mr. Mills also argued that the due process clause of the Wyoming Constitution required suppression because Detective Donahue used coercive tactics, but he has not asserted that claim on appeal.

At approximately 51 minutes and 9 seconds into the interview or 21 minutes and 10 seconds into video file number two the Defendant had just been told by Detective Donahue to wait there. Detective Donahue then took the Defendant's cell phone, without permission, and left the interview room. Yet, before he did Detective Donahue told the Defendant he would not give the phone to Courtnie as requested, nor could the Defendant speak to her. Thus, at this time the Defendant was advised to stay in the room, his phone was taken, and he was not allowed to speak to his wife. Under these facts and circumstances a reasonable person would rightly believe that they were not free to leave, and that their freedom of action was curtailed in a significant fashion.

As noted, the facts and circumstances throughout the interview inched closer and closer toward custody, with these facts and circumstances pushing the interview firmly into a custodial interrogation. Accordingly, for all these reasons, the "un-*Mirandized*" statements made by the Defendant after this point in time were made in violation of *Miranda* and are inadmissible in the States' case-in-chief.

[¶32]  As to the voluntariness of his confession, Mr. Mills argued he was in a vulnerable state because he had drunk heavily the night before, could not remember many details of the evening, had slept for only two hours, and been awake for nearly seven hours when Detective Donahue questioned him. He argued that under those conditions, he was induced to confess by Detective Donahue's pressing questions and assurances that he was not trying to ruin his life, disrupt his family, or upend all his hard work.

[¶33]  The district court rejected Mr. Mills' claim. It concluded:

The Defendant agreed to speak to the police, he arrived voluntarily, he was alert, and was not stumbling, staggering, or slurring his words. In fact, it appeared that the Defendant was in complete control of his faculties, he was aware of the situation, he was told that he was not under arrest, he was not handcuffed, and the interview did not occur in a physical or mentally threatening or improper atmosphere. Overall, the Defendant's will was not overborne and his statements were made voluntarily. Similarly, even after the Defendant was in custody (at approximately 51 minutes and 9 seconds into the

8

interview), his continued statements were, based upon the totality of circumstances, voluntary for the same reasons.

[¶34] At the trial, the jury heard and viewed the portion of Mr. Mills' interview the district court ruled admissible. The court instructed the jury on the elements of first-degree murder, which was the charged offense, and on the lesser included offenses of second-degree murder and voluntary manslaughter. The jury found Mr. Mills guilty of second-degree murder, and the court sentenced him to a prison term of twenty to twenty-five years. Mr. Mills timely appealed to this Court.

## *STANDARD OF REVIEW*

[¶35] We review rulings on a motion to suppress as follows:

> When we review the denial of a motion to suppress, we adopt the district court's factual findings unless they are clearly erroneous. *Rodriguez v. State*, 2018 WY 134, ¶ 15, 430 P.3d 766, 770 (Wyo. 2018). Because the district court had the opportunity to "assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions," we view the evidence in the light most favorable to its decision. *Id.* We review issues of law de novo. *Jelle v. State*, 2005 WY 111, ¶ 13, 119 P.3d 403, 407 (Wyo. 2005) (citing *Mackrill v. State*, 2004 WY 129, ¶ 12, 100 P.3d 361, 364 (Wyo. 2004)).

*Schwartz v. State*, 2021 WY 48, ¶ 9, 483 P.3d 861, 864 (Wyo. 2021).

[¶36] "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)). In conducting our review, we defer to the district court's findings of fact, but how the findings affect the ultimate question of custody is a question of law we review de novo. *Schwartz*, 2021 WY 48, ¶ 9, 483 P.3d at 864; *see also United States v. Slaight*, 620 F.3d 816, 821 (7th Cir. 2010) ("[A]ppellate review of a judge's finding that an interrogation was not custodial is plenary.") (citing *Thompson v. Keohane*, 516 U.S. 99, 112, 115-16, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). In doing so, we readily acknowledge that defining the point when an interrogation becomes custodial is no easy task. *See Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) ("Unfortunately, the task of defining 'custody' is a slippery one[.]").

*DISCUSSION*

***I. The district court erred in ruling that Mr. Mills was not in custody during his police station interview until such time as law enforcement took his cell phone, declined his request to speak to his wife, and directed him to remain in an interview room.***

[¶37]   "The theory of the privilege against self-incrimination is a good, high-principled concept aimed at the preservation of the very most basic of the individual's rights in a democratic society and one which should be readily embraced by all of us." *Westmark v. State*, 693 P.2d 220, 223 (Wyo. 1984) (quoting *Jerskey v. State*, 546 P.2d 173, 175 (Wyo. 1976)). The *Miranda* rule aims to protect "defendants against government coercion leading them to surrender rights protected by the Fifth Amendment." *Jendresen v. State*, 2021 WY 82, ¶ 30, 491 P.3d 273, 282 (Wyo. 2021) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986)). The Supreme Court has explained:

> The Miranda decision was based in large part on this Court's view that the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation in the presumptively coercive environment of the station house.

*New York v. Quarles*, 467 U.S. 649, 656, 104 S.Ct. 2626, 2632, 81 L.Ed.2d 550 (1984); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011) ("Recognizing that the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements, this Court in *Miranda* adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination.") (cleaned up).

[¶38]   "*Miranda* requires statements made by a suspect during a custodial interrogation be excluded if the suspect is not given the requisite advisements." *Schwartz*, 2021 WY 48, ¶ 10, 483 P.3d at 864 (citing *Jelle v. State*, 2005 WY 111, ¶ 14, 119 P.3d 403, 407 (Wyo. 2005)). "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Tate*, 2016 WY 102, ¶ 18, 382 P.3d at 767 (quoting *Gunn v. State*, 2003 WY 24, ¶ 8, 64 P.3d 716, 720 (Wyo. 2003)). It is undisputed that Detective Donahue's interview of Mr. Mills was an interrogation. The question is when it became custodial.

[¶39]   We consider the totality of the circumstances to determine whether and when a suspect is in custody during police questioning. *Schwartz*, 2021 WY 48, ¶ 10, 483 P.3d at 864 (citing *Jelle*, 2005 WY 111, ¶ 14, 119 P.3d at 408). "[B]eing placed in 'custody' for *Miranda* purposes can occur before actual arrest." *Bhutto v. State*, 2005 WY 78, ¶ 15, 114 P.3d 1252, 1260 (Wyo. 2005) (quoting *Martinez v. State*, 943 P.2d 1178, 1181 (Wyo.

10

1997)). "The key question is whether a reasonable man in the suspect's position would consider himself in police custody." *Schwartz*, 2021 WY 48, ¶ 10, 483 P.3d at 864 (citing *Barnes v. State*, 2008 WY 6, ¶ 14, 174 P.3d 732, 737 (Wyo. 2008)); *see also J.D.B.*, 564 U.S. at 279, 131 S.Ct. at 2407 ("[T]he whole point of the custody analysis is to determine whether, given the circumstances, 'a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave.'") (quoting *Thompson*, 516 U.S. at 112, 116 S.Ct. at 465). Because we evaluate the nature of police interrogation using an objective "reasonable man" standard, the subjective beliefs or feelings of the officer and suspect are not relevant to the question of whether an interrogation was custodial. *Engdahl v. State*, 2014 WY 76, ¶ 19, 327 P.3d 114, 119 (Wyo. 2014) (quoting *Nava v. State*, 2010 WY 46, ¶ 10, 228 P.3d 1311, 1314 (Wyo. 2010)); *see also J.D.B.*, 564 U.S. at 271, 131 S.Ct. at 2402 ("The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning.") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667, 124 S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004)).

[¶40]   We have defined several factors that may be relevant to the determination whether an interrogation was custodial:

> We examine the totality of the circumstances, focusing on several factors: "(1) whether a suspect is questioned in familiar or neutral surroundings; (2) the number of police officers present; (3) the degree of physical restraint and whether it is comparable to those associated with a formal arrest; and (4) the duration and character of the interrogation."

*Rodriguez v. State*, 2018 WY 134, ¶ 28, 430 P.3d 766, 772-73 (Wyo. 2018) (quoting *Engdahl*, 2014 WY 76, ¶ 15, 327 P.3d at 119).

[¶41]   The Tenth Circuit Court of Appeals has elaborated on these factors:

> This is a fact-intensive inquiry focusing on the totality of the circumstances. *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993). Helpful to our analysis is whether the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will and the nature of the questioning, including whether the questioning is prolonged and accusatory. *Id.* In addition, we analyze whether the environment was "police dominated." *Id.* Indications of whether the police are in full control may include whether the suspect was separated from his family and isolated in a nonpublic questioning room, whether there was the threatening presence of several officers, whether there was any display of weapons or physical contact with the suspect, and whether the

11

officer's language and tone indicated that compliance might be compelled. *Id.* at 1518-19.

*United States v. Chee*, 514 F.3d 1106, 1112-13 (10th Cir. 2008); *see also United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021), *cert denied*, 142 S.Ct. 785, 211 L.Ed.2d 489 (2022).

[¶42]   At the suppression hearing, Mr. Mills argued he was in custody during the entirety of his interview with Detective Donahue. On appeal, however, he has focused on a different point in time. He contends that he was in custody at the point in the interview that Detective Donahue told him he knew that his wife wanted to call the police but did not because of Mr. Mills' conversation with her. The district court determined that custody occurred at a later point, when Detective Donahue took Mr. Mills' cell phone and directed him to remain in the interview room. Under the totality of the circumstances, we conclude that custody occurred at a point in between these two, when Mr. Mills confessed that he shot Mr. Bartlett.

[¶43]   There is no question that Mr. Mills' interaction with Detective Donahue began as noncustodial. The Mills called law enforcement to their home and voluntarily responded to the detective's questions. *See Bhutto*, 2005 WY 78, ¶ 11, 114 P.3d at 1258 ("general on-the-scene questioning as to facts surrounding a crime" does not qualify as custodial interrogation) (citing *Miranda*, 384 U.S. at 477-78, 86 S.Ct. at 1629-30). Additionally, Mr. Mills agreed to be interviewed and voluntarily came to the station. *Hannon v. State*, 2004 WY 8, ¶ 48, 84 P.3d 320, 339 (Wyo. 2004) (that defendant voluntarily came to the station weighed against custody finding); *Roderick v. State*, 858 P.2d 538, 546 (Wyo. 1993) (that defendant voluntarily came to interviews weighed against custody finding). Certainly, though, evolving circumstances can change the nature of an interaction.

> Similarly, the fact that one goes to the police station voluntarily does not necessarily mean that he or she can also *leave* voluntarily, for "at some point the words and conduct of the interrogating officers may transform that which once was a noncustodial, 'voluntary' event into a custodial interrogation."

*State v. Muntean*, 12 A.3d 518, 526 (Vt. 2010) (emphasis in original) (quoting *Rigterink v. State*, 2 So.3d 221, 244 (Fla. 2009), *cert. granted, judgment vacated*, 559 U.S. 965, 130 S.Ct. 1235, 176 L.Ed.2d 175 (2010)); *see also State v. McKenna*, 103 A.3d at 768, 762 (N.H. 2014) ("Interrogations are fluid: What may begin as noncustodial questioning may evolve over time into custodial questioning."); *Garcia v. State*, 237 S.W.3d 833, 836 (Tex. App. 2007) ("[A]n interrogation that begins as noncustodial may escalate into a custodial

interrogation based on the conduct of law enforcement during the encounter.").[3] We thus turn to the other factors that impact the determination of when Mr. Mills' interview became custodial.

**A. The location of Mr. Mills' interrogation weighs in favor of a finding of custody.**

[¶44]   The fact that an interrogation takes place in a police station is not sufficient to render it custodial. *Hannon*, 2004 WY 8, ¶ 40, 84 P.3d at 337 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). It is, however, a factor that weighs in favor of custody. *Yarborough*, 541 U.S. at 665, 124 S.Ct. at 2150 (citing fact that defendant was questioned at police station as a factor favoring view that he was in custody); *see also Rodriguez*, 2018 WY 134, ¶ 28, 430 P.3d at 772.

[¶45]   That Mr. Mills was interviewed in a room, in a secure part of the station, with the door closed, is also a factor weighing in favor of custody. *United States v. Bowman*, 38 F.Supp.3d 1278, 1293 (D. Utah 2014) (citing as factor favoring custody that interview was in secure area and suspect had to pass through locked doors in company of officers to get to room); *Muntean*, 12 A.3d at 525-26 (finding it unlikely a reasonable person would have felt free to leave after being led to a room in a secure part of station). This had the effect of separating him from his family and isolating him from the public, factors indicative of a police-dominated atmosphere. *Chee*, 514 F.3d at 1113 ("Indications of whether the police are in full control may include whether the suspect was separated from his family and isolated in a nonpublic questioning room[.]"); *see also Miranda*, 384 U.S. at 449-50, 86 S.Ct. at 1615 (interviewing suspect in isolated area of police station is intended to create an atmosphere that "suggests the invincibility of the forces of the law"); *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020) ("Officers may 'dominate' an encounter by displaying a weapon, making physical contact, isolating the suspect in a police-controlled environment, or appearing in overwhelming numbers.").

**B. Detective Donahue's lone presence, his tone, the lack of physical restraints, and the fact that Mr. Mills was permitted to retain his cell phone weigh in favor of finding the interrogation was not custodial.**

[¶46]   Detective Donahue was the only officer in the room during his interview of Mr. Mills, a fact that weighs against a finding of custody. *Nava*, 2010 WY 46, ¶ 14, 228 P.3d at 1315; *Jelle*, 2005 WY 111, ¶ 18, 119 P.3d at 410. The district court found that throughout the interview, the detective spoke to Mr. Mills in "a calm, polite, conversational, and

---

[3] As the Supreme Court has explained, the circumstances are considered cumulatively. "Each circumstance goes to how a reasonable person would internalize and perceive every other. Indeed, this is the very reason that we ask whether the objective circumstances add up to custody, instead of evaluating the circumstances one by one." *J.D.B.*, 564 U.S. at 278, 131 S.Ct. at 2407 (cleaned up); *see also United States v. Jacob*, 431 F.3d 99, 107 (3rd Cir. 2005) (a factor that alone does not indicate custody per se may in concert with others add up to custody).

professional tone." The record supports this finding, and the detective's demeanor is also a factor that weighs against a finding of custody. *CSC v. State*, 2005 WY 106, ¶ 27, 118 P.3d 970, 977 (Wyo. 2005) (investigator's demeanor was "calm and respectful"); *Hannon*, 2004 WY 8, ¶ 48, 84 P.3d at 339 (deputy "spoke quietly and politely"); *but see Slaight*, 620 F.3d at 821 (an officer's politeness does not create a "safe harbor" from *Miranda* constraints).

[¶47]   Mr. Mills was not restrained and was initially permitted to retain his cell phone, which also weighs against a finding of custody. *Nava*, 2010 WY 46, ¶ 14, 228 P.3d at 1315 (lack of restraint); *CSC*, 2005 WY 106, ¶ 27, 118 P.3d at 977 (lack of restraint); *United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (en banc) ("While the mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained."); *United States v. Unser*, 165 F.3d 755, 766 (10th Cir. 1999) (noting that use of a cell phone during an interview is a factor supporting a finding of no custody).

**C. Mr. Mills was told he was not under arrest, which weighs against a finding that the interrogation was custodial.**

[¶48]   At the outset of Mr. Mills' interview, Detective Donahue advised him he was not under arrest, a factor that weighs against a finding of custody. *Jelle*, 2005 WY 111, ¶¶ 17-18, 119 P.3d at 409-10; *Roderick*, 858 P.2d at 546. Like any other factor, however, this statement is not conclusive of the custody question. *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) ("[T]here is no precedent for the contention that a law enforcement officer simply stating to a suspect that he is 'not under arrest' is sufficient to end the inquiry into whether the suspect was 'in custody' during an interrogation."); *see also United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) ("[T]he mere utterance of the words 'you are not under arrest' does not end the 'in custody' analysis but rather the words must be taken in the larger context of the totality of the circumstances[.]") (quoting *Colonna*, 511 F.3d at 435-36).

**D. Mr. Mills was not told he was free to leave or end the interview, or that he did not have to answer questions, which weighs in favor of finding the interrogation was custodial.**

[¶49]   Whether the police make a suspect aware that he is free to refrain from answering questions, or to otherwise end the interview, is a factor in determining whether an interrogation is custodial. *Guillen*, 995 F.3d at 1109 (quoting *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007)); *see also Howes v. Fields*, 565 U.S. 499, 515, 132 S.Ct. 1181, 1193, 182 L.Ed.2d 17 (2012) ("Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted."). This differs from telling a suspect that he is not under arrest.

*United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010) ("[A]lthough advising someone that he or she is not under arrest mitigates an interview's custodial nature, 'an explicit assertion that the person may end the encounter is stronger medicine.'") (quoting *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006)). When a suspect is not informed that he is free to end the interview or decline to answer questions, "[t]hat is 'a significant indication of a custodial detention.'" *Guillen*, 995 F.3d at 1109 (quoting *Griffin*, 7 F.3d at 1518); *see also United States v. Erving L.*, 147 F.3d 1240, 1247 n.5 (10th Cir. 1998) (The "extent to which defendant is informed he is free to refrain from answering questions 'will often define the custodial setting.'") (quoting *Griffin*, 7 F.3d at 1518).

[¶50]   Notably, unlike in *Jelle*, *Roderick*, and other cases, Detective Donahue did not at any point, either before or during the interview, tell Mr. Mills he was free to leave or that he did not have to answer questions. *Nava*, 2010 WY 46, ¶ 14, 228 P.3d at 1315 (trooper told appellant he was free to go and did not have to answer additional questions); *Jelle*, 2005 WY 111, ¶ 17, 119 P.3d at 409 ("[T]he appellant was informed that he was not under arrest **and** that he did not have to talk to the officers.") (emphasis added); *CSC*, 2005 WY 106, ¶ 27, 118 P.3d at 977 (investigator "repeatedly and specifically assured CSC that he was not obligated to answer any questions, could leave at any time, and would not be arrested that day"); *Hannon*, 2004 WY 8, ¶ 48, 84 P.3d at 339 (defendant "was told he did not have to answer questions, would not be arrested that day and was free to leave at any time"); *Roderick*, 858 P.2d at 546 (defendant told he was not under arrest, did not have to speak, and could leave any time he wanted). Detective Donahue's failure to tell Mr. Mills that he was free to leave or terminate the interview is a factor that weighs significantly in favor of finding the interrogation custodial.

**E. Detective Donahue pressed Mr. Mills with evidence of his guilt and indicated his disbelief of Mr. Mills' version of events, which weighs in favor of a finding the interrogation was custodial.**

[¶51]   Going into his interview of Mr. Mills, Detective Donahue knew that Mr. Mills had shot Mr. Bartlett, that he had taken steps to conceal his crime and make it appear that Mr. Bartlett had committed suicide, and that he had lied about what happened. Mr. Mills argued below, and argues on appeal, that at the point in the interview at which Detective Donahue confronted him with these incriminating facts, a reasonable person would not have felt free to terminate the interview and leave, and he was therefore in custody. The district court rejected this claim. It reasoned:

> As noted, Detective Donahue's unarticulated subjective belief is irrelevant to this analysis. *See Bhutto*, 2005 WY 78, ¶ 12. What is relevant, are the facts and circumstances that actually happened. Again, Detective Donahue made no threats or promises to the Defendant, and he spoke in a calm and conversational tone. Detective Donahue did not accuse the

> Defendant of lying, rather, he simply informed the Defendant of what his wife and daughter said. Detective Donahue did not lie to the Defendant, he did not tell him what to say, rather he simply told him the truth – that is, he spoke to the Defendant's wife and daughter and they were telling a different story.
>
> Having repeatedly watched the video and the interaction between the Defendant and Detective Donahue the court can think of a host of reasons why the Defendant decided to deviate from his original story. However, none of them were because the Defendant was in custody or forced or coerced to agree, comply, or continue to speak. A reasonable person, that is one who does not have a guilty state of mind, would not have felt compelled to change his story or continue with the interview just because the Detective told them what the other witnesses had said. The Defendant's freedom was not constrained in any significant way, and the interview up to this point was not custodial.

[¶52]  The district court correctly observed that an officer's subjective and unarticulated beliefs or feelings are not relevant to the question of custody. *Engdahl*, 2014 WY 76, ¶ 19, 327 P.3d at 119; *Bhutto*, 2005 WY 78, ¶ 12, 114 P.3d at 1259. If an officer's beliefs or suspicions are not articulated to a suspect, it is understood that those uncommunicated beliefs or suspicions will not affect whether a reasonable person would feel free to terminate an interview. *Stansbury v. California*, 511 U.S. 318, 319, 114 S.Ct. 1526, 1527, 128 L.Ed.2d 293 (1994). On the other hand, once those beliefs or suspicions are made known to the suspect, they become relevant to the custody question.

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action. Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.

*Id.*, 511 U.S. at 325, 114 S.Ct. at 1530 (cleaned up).

16

[¶53]  By the time Detective Donahue was about thirty-four to thirty-five minutes into the interview, he had told Mr. Mills:

- I know what you told us this morning and what you're telling me now. There're things that don't make sense;

- Based on crime scene tools and my training, I have a pretty good idea of what actually took place;

- I know sometime around 1:00, you and Courtnie had a specific conversation. I know the nature of the conversation and the details;

- I know MM heard the conversation;

- I know the idea that you don't know what happened is inaccurate;

- I know you can remember certain things;

- I know about your clothes;

- You went in and talked to Courtnie. There was a physical altercation between you and Trevor. Something happened with the gun;

- There's more to this. Whether you're intentionally blocking, you had some very specific conversations, did some specific things, and I know all about it; and

- This is very important because we both know you didn't just go to bed. Courtnie wanted to call the police and she didn't because of your conversation and because she wanted to find a way to make this better.

[¶54]  A reasonable person confronted in this manner would understand that law enforcement had evidence he committed a serious crime. That understanding is a factor that weighs significantly in favor of finding custody. *Slaight*, 620 F.3d at 822 (citing as key factor in custody analysis the "likelihood that [defendant] would be formally placed under arrest if he tried to leave because the government already had so much evidence against him"); *State v. Pitts*, 936 So.2d 1111, 1127 (Fla. Dist. Ct. App. 2006) ("Although not necessarily dispositive, the extent to which the suspect is confronted with evidence of his or her guilt can be a circumstance that weighs heavily in the balances.") (cleaned up). As another court analyzed:

17

Near the start of the interview, the detective indicated that defendant's daughters and grandsons had independently alleged that defendant had sexually abused them. A reasonable person would not feel at liberty to terminate a police interview after being confronted with such evidence, as a "reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime."

*Muntean*, 12 A.3d at 528 (quoting *Pitts*, 936 So.2d at 1128); *see also Guillen*, 995 F.3d at 1109; *Buck v. State*, 956 A.2d 884, 906 (Md. Ct. Spec. App. 2008); *People v. Minjarez*, 81 P.3d 348, 356 (Colo. 2003).

[¶55]  The Tenth Circuit's decision in *Guillen* illustrates the impact of this factor. In that case, the defendant was arrested after he planted a pressure cooker bomb under a woman's bed, and he entered a conditional guilty plea to charges relating to possession of the device and attempted building damage. 995 F.3d at 1100. He appealed the denial of his motion to suppress incriminating statements he made to federal agents after they arrived at his home to execute a search warrant. *Id.* at 1100, 1101-02. Although there were five agents present in the home, only two interviewed him. *Id.*

> Agents Rominger and Greene questioned Ethan at the kitchen table for about 50 minutes, during which time he repeatedly denied any involvement with making the pressure cooker bomb. After the search ended, the agents asked Ethan, who was then sitting on the couch in the living room, to return to the kitchen table. Agent Rominger then laid out the evidence discovered during the search, told Ethan it pointed to him, and asked if he created the improvised explosive device. Ethan hesitated, took a deep breath, and then said: "Yes, I made it." Agent Rominger immediately read Ethan his *Miranda* rights.
>
> Ethan acknowledged he understood his rights, continued to respond to the agents' questions, and provided information about his involvement with making the device for the next 20 to 40 minutes.

*Id.* at 1102.

[¶56]  The district court suppressed the defendant's pre-*Miranda* confession, finding "the agents' questioning moved beyond simply attempting to elicit information to custodial interrogation when they confronted Ethan with the evidence discovered during the search." *Guillen*, 995 F.3d at 1103. It further concluded, however, "that Agent Rominger's

18

administration of the *Miranda* warnings after that initial statement was sufficient to advise Ethan of his rights and render his postwarning statements admissible." *Id.* The Tenth Circuit affirmed. *Id.* at 1124.

[¶57]  In considering the totality of the circumstances surrounding the defendant's pre-*Miranda* statement, the court found that the failure of the agents to inform the defendant that he could end the interview or decline to answer questions was "a significant indication of a custodial detention." *Guillen*, 995 F.3d at 1109 (quoting *Griffin*, 7 F.3d at 1518). On the other hand, the court concluded the interview did not take place in a police-dominated atmosphere because the defendant was in his own home, he was allowed to move freely about the home, and his father and brother were present, with his father occasionally participating in the interview. *Id.* Also weighing against a finding of custody was the duration of the interview, about an hour, and the fact that the agents did not speak in threatening tones. *Id.* at 1109-10. What finally tipped the scales to a custodial interrogation was the accusatory questioning, which the court summarized:

> We know that you purchased a pressure cooker and it's gone. We know that a soldering iron was used in this device, and your dad's soldering iron is missing. White tape, like was found on the device, is found in the backpack. And there's a table that looks like it has black powder burns, and there's burns and fuses on that table.

*Id.* at 1110.

[¶58]  The court concluded the defendant was not in custody until that point when agents confronted him with the evidence discovered during the search. *Guillen*, 995 F.3d at 1110 ("[T]he situation evolved when Agent Rominger pressed Ethan despite his repeated denials of involvement and then confronted him with the mounting information and evidence collected during the search."). It reasoned:

> It is difficult to ignore the effect that Agent Rominger's accusatory questioning had on the nature of the interrogation under the circumstances Ethan faced. With the search of the Guillen residence completed prior to Ethan's second round of pre-*Miranda* questioning, there was little remaining for the agents to do other than to leave or place Ethan under arrest. Considering the evidence the agents had discovered, an arrest was likely, and—after being confronted with that evidence—a reasonable person in Ethan's shoes would have recognized as much. Thus, Ethan would have reasonably understood his

situation as the functional equivalent of formal arrest when Agent Rominger elicited his initial confession.

*Id.* at 1111 (cleaned up).[4]

[¶59]  Similarly, in this case, Detective Donahue pressed Mr. Mills despite his repeated denials and confronted him with increasingly specific evidence against him. However, we must also consider our decision in *Hannon*, where we reached a different result from *Guillen* and held a suspect was not in custody despite being repeatedly confronted and pressed with evidence against him. *Hannon*, 2004 WY 8, ¶ 48, 84 P.3d at 339. In *Hannon*, a deputy interviewed the defendant concerning allegations he sexually abused a minor. *Id.* at ¶¶ 33-35, 84 P.3d at 334-36. The deputy repeatedly confronted him with specifics of those allegations, saying words to the effect, "I know that happened," and identifying alleged evidence against him. *Id.* The deputy at no time advised Mr. Hannon of his *Miranda* rights. In concluding the interrogation was not custodial, this Court reasoned:

> We have carefully reviewed the totality of the circumstances and are persuaded based upon controlling law that Mr. Hannon was not in custody at the time he was interviewed by Deputy Mueller. No evidence was presented that he came to the sheriff's department against his will. He was told he did not have to answer questions, would not be arrested that day and was free to leave at any time. The videotape clearly shows Deputy Mueller spoke quietly and politely. There were no threats, outbursts or hostile accusations. And Mr. Hannon left the station when the interview ended.

*Id.* at ¶ 48, 84 P.3d at 339.

[¶60]  Although the questioning in *Hannon* was arguably more pressing than that in this case, steps were taken to ameliorate the effects of the accusatory questions. Mr. Hannon was told not only that he was not under arrest, but also that he would not be arrested that day. Additionally, he was advised he did not have to answer questions and was free to leave at any time. Finally, he was in fact permitted to leave the station after the interview. *See Howes*, 565 U.S. at 509, 132 S.Ct. at 1189 (recognizing "the release of the interviewee at the end of the questioning" as a relevant factor in considering totality of the circumstances) (citing *California v. Beheler*, 463 U.S. 1121, 1122-1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam*)); *see also Gompf v. State*, 2005 WY 112, ¶ 33, 120 P.3d 980, 989 ("elapsed amount of time between questioning and the arrest" as factor in custody analysis)

---

[4] In so holding, the court rejected the government's argument that the encounter turned custodial when the defendant confessed. *Guillen*, 995 F.3d at 1110-11.

(citing *Wunder v. State*, 705 P.2d 333, 335 (Wyo. 1985)). We thus do not read *Hannon* as diminishing the significance of accusatory questions in determining when an interrogation becomes custodial.[5]

[¶61]  The district court concluded that Detective Donahue's pressing of Mr. Mills with his wife's statements did not have a significant effect on the custodial status of the interrogation. It further concluded that it was only after Mr. Mills confessed to shooting Mr. Bartlett, that the situation began "inching ever closer to custody[.]" With due regard to the court's findings of fact, its analysis of this factor understated the impact that confronting Mr. Mills with evidence of his guilt had on the interview as a matter of law.

[¶62]  Detective Donahue's polite, conversational tone notwithstanding, we conclude, as a matter of law, that when he confronted Mr. Mills' denials with increasingly specific statements of the evidence against him, it had a significant effect on the atmosphere of the interrogation. As another court reasoned:

> An officer informed the defendant at the beginning of the interview that police were investigating a shooting in which one of the victims had died, and that the defendant had been identified as the shooter by the surviving victim. Thus, even though the interview took place in the defendant's attorney's office, lasted for no more than five or ten minutes, and was conducted in a conversational tone, a reasonable person in the defendant's position would not have believed he was free to leave.

*Commonwealth v. Simon*, 923 N.E.2d 58, 66 (Mass. 2010); *see also State v. Carrier*, 238 A.3d 1018, 1029 n.3 (N.H. 2020) ("Neither the absence of hostility on the part of the detectives, nor the polite tone of the interrogation, neutralizes the content or import of the accusatory questions and statements, nor diminishes the weight which we accord to them.") (cleaned up) (quoting *McKenna*, 103 A.3d at 768); *Slaight*, 620 F.3d at 821 (interviewer's politeness does not create a safe harbor from *Miranda's* constraints).

[¶63]  Although we conclude Detective Donahue's accusatory questioning did not transform the interrogation into a custodial one, as occurred in *Guillen*, it certainly pushed it firmly in that direction. A reasonable person confronted with evidence he killed a person, lied about it, and attempted to conceal the crime, including the statements of his own wife, would be very close to understanding he was not free to leave the police station. This is particularly so, since unlike in *Hannon*, Detective Donahue never advised Mr. Mills he did not have to answer questions and was free to leave.

---

[5] We also note that in *Hannon*, we did not specifically address the effect of accusatory questioning on the custody question.

[¶64] We thus conclude that the accusatory questioning not only inched the interrogation toward custodial, it pushed it to the brink. As we will discuss next, Mr. Mills' confession pushed it over the edge, and at that point, the interrogation became custodial.

**F. Detective Donahue's interrogation of Mr. Mills became custodial when Mr. Mills confessed to shooting Mr. Bartlett.**

[¶65] About thirty seconds after Detective Donahue told Mr. Mills that he knew his wife had wanted to call the police, Mr. Mills said, "So you're saying I shot Trevor." Detective Donahue responded, "I'm asking you." At this point, Mr. Mills' breathing became labored, and the detective said, "I want to help you out." Mr. Mills continued to hyperventilate, and Detective Donahue asked again about his conversation with his wife and said, "Right now, you're seeing what happened." Seconds after that, roughly thirty-six minutes into the interview, Mr. Mills stated, "Oh sh**, I shot Trevor."

[¶66] The United States Supreme Court has never held that a suspect's confession to a crime will in itself transform an interview into a custodial interrogation. *Chee*, 514 F.3d at 1114 ("No Supreme Court case supports the contention that admission to a crime transforms an interview by the police into a custodial interrogation.") (quoting *Locke v. Cattell*, 476 F.3d 46, 53 (1st Cir. 2007)). It is, however, a factor in the totality of the circumstances test. *Kolb v. State*, 930 P.2d 1238, 1244 (Wyo. 1996); *Barrientos v. State*, 279 So.3d 256, 259-60 (Fla. Dist. Ct. App. 2019); *State v. Godwin*, 436 P.3d 1252, 1265 (Idaho 2019); *State v. Bartelt*, 906 N.W.2d 684, 698 (Wis. 2018); *State v. Edwards*, 11 A.3d 116, 125 (Conn. 2011); *State v. Thomas*, 33 A.3d 494, 512-14 (Md. Ct. Spec. App. 2011), *aff'd*, 55 A.3d 680 (Md. 2012); *Muntean*, 12 A.3d at 529; *State v. Oney*, 989 A.2d 995, 1000 (Vt. 2009); *Commonwealth v. Hilton*, 823 N.E.2d 383, 396 (Mass. 2005); *People v. Carroll*, 742 N.E.2d 1247, 1250 (Ill. App. Ct. 2001); *Jackson v. State*, 528 S.E.2d 232, 235 (Ga. 2000*); State v. Linck*, 708 N.E.2d 60, 63 (Ind. Ct. App. 1999), *abrogated on other grounds by Russell v. State*, 2015 WL 302288 (Ind. Ct. App. 2015) (unpublished disposition); *People v. Ripic*, 587 N.Y.S.2d 776, 782 (N.Y. App. Div. 1992); *McCrory v. State*, 643 S.W.2d 725, 733 (Tex. Crim. App. 1982). As our Court aptly reasoned in *Kolb*:

> After Mr. Kolb confessed to the killing, he was in custody under *Thompson v. Keohane*, 516 U.S. at ——, 116 S.Ct. at 459. A reasonable person who confessed to a killing while being interviewed at a police station would not feel free to terminate the interview and leave the station.

*Kolb*, 930 P.2d at 1244[6]; *see also Barrientos*, 279 So.3d at 259 ("A reasonable person understands that when a suspect confesses to committing a serious criminal act, the police ordinarily will not permit the suspect to go free."); *Hilton*, 823 N.E.2d at 396 ("[A] person who has just confessed to a crime would reasonably expect that she was no longer free to leave.").

[¶67]   The impact of a suspect's confession on the custody question will depend in part on the seriousness of the crime. *Godwin*, 436 P.3d at 1265 ("Confession to a serious crime can be considered as a factor in the totality-of-the-circumstances inquiry."); *Muntean*, 12 A.3d at 529 ("We acknowledge that once a suspect confesses to committing a serious criminal act, this fact is significant in this evaluation. However, the severity of the crime confessed to affects the weight we attribute to this factor.") (quoting *Oney*, 989 A.2d at 1000); *Locke*, 476 F.3d at 54 ("We believe it likely that a reasonable person would not have felt that he was at liberty to terminate the interrogation and leave after confessing to a violent crime and learning that a co-defendant has implicated him."); *Ripic*, 587 N.Y.S.2d at 782 ("utter sophistry" to suggest that defendant who confessed to killing would feel free to leave); *McCrory*, 643 S.W.2d at 733 ("[I]t strains credulity to suggest appellant himself thought he could admit commission of this capital murder to [officer], shake hands around, glance at his watch as he informed the group he was late for another appointment, and walk out the door!").

[¶68]   An additional factor courts consider is the atmosphere of the interview after the suspect confesses. *Bartelt*, 906 N.W.2d at 698; *Edwards*, 11 A.3d at 125; *Thomas*, 33 A.3d at 512-13; *Chee*, 514 F.3d at 1114; *Locke*, 476 F.3d at 53; *Hilton*, 823 N.E.2d at 397. While this can be a relevant factor, it weighs less heavily in this case where significant pre-confession factors contribute to a finding of custody. *See, e.g.*, *Bartelt*, 906 N.W.2d at 695 (defendant advised "he could 'get up and walk out of here any time he wanted'"); *Locke*, 476 F.3d at 53-54 (lack of a change in atmosphere significant where defendant "was told at least five times that he did not have to speak with the police and that he was free to leave"). In this case, the interrogation was on the verge of becoming custodial, and then Mr. Mills confessed. Under these circumstances, we give no weight to the atmosphere after the confession.

[¶69]   The decision of the First Circuit Court of Appeals in *Locke* illustrates the substantial impact that the combination of accusatory questioning and a confession can have on an interrogation. In that case, the defendant voluntarily accompanied officers to a police station and was repeatedly told he was free to leave and did not have to speak with them. *Locke*, 476 F.3d at 49. After being aggressively confronted with evidence against him, including the statements of his co-defendant, he confessed to a limited role in a robbery and murder, and eventually to his full involvement. *Id.* at 49-50. The New Hampshire

---

[6] *Thompson*, 516 U.S. at 100, 116 S.Ct. at 459 did not address the effect of a suspect's confession. The cite in *Kolb* is to the test for determining custody.

23

Supreme Court held that Locke was not in custody at any point in the interview because he was repeatedly told he was free to go. *Id.* at 50. The First Circuit "reluctantly" upheld the denial of Locke's petition for writ of habeas corpus based on the constraints of its standard of review.

> If this case were before us on de novo review, we might well reach a different result. We believe it likely that a reasonable person would not have felt that he was at liberty to terminate the interrogation and leave after confessing to a violent crime and learning that a co-defendant has implicated him. Reluctantly, however, we conclude that such a holding by the state court is not an unreasonable application of clearly established federal law. Thus, we are constrained by the deferential standard of review to affirm the state court's determination that Locke was not in custody. "Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court applied the law incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

*Id.* at 54.

[¶70]   In *Locke*, it is apparent that, in the First Circuit's view, the confrontational nature of the questioning undermined the effects of the repeated advisements that the defendant was free to leave. *See also Carroll*, 742 N.E.2d at 1250 (observing that assurances to the contrary will not overcome what a reasonable person would understand to be a custodial situation). In this case, Detective Donahue's questioning was less aggressive than that in *Locke*, but Mr. Mills was given no assurances he was free to leave. In our de novo consideration of the totality of the circumstances, we must conclude that Mr. Mills was in custody when he admitted he shot Mr. Bartlett in the head. He was in an interview room in a police station, where he had been confronted with evidence that he killed Mr. Bartlett, including his wife's statements. He had also been confronted with evidence that he lied about the crime and attempted to conceal it. He had at no point been told he was free to terminate the interview and leave, and he had confessed to the crime. A reasonable person under such circumstances would not feel free to terminate the interview and leave the police station. Mr. Mills' interrogation became custodial at that point, and he should have been given a *Miranda* warning.

[¶71]   "*Miranda* requires statements made by a suspect during a custodial interrogation be excluded if the suspect is not given the requisite advisements." *Schwartz*, 2021 WY 48, ¶ 10, 483 P.3d at 864 (citing *Jelle*, 2005 WY 111, ¶ 14, 119 P.3d at 407). Based on our holding, Mr. Mills' statements after he said, "Oh sh\*\*, I shot Trevor," should have been

24

suppressed. The next question is whether the failure to suppress requires reversal of Mr. Mills' conviction.

***II. It was not harmless error to admit incriminating statements Mr. Mills made after his interrogation became custodial.***

[¶72] We review the admission of statements that should have been suppressed for harmless error. *Snyder v. State*, 2021 WY 108, ¶ 37, 496 P.3d 1239, 1250 (Wyo. 2021) (quoting *Lewis v. State*, 2002 WY 92, ¶ 26, 48 P.3d 1063, 1071 (Wyo. 2002)). When the statements should have been suppressed because of a *Miranda* violation, we have said "the question is whether the erroneously admitted evidence had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Lewis*, 2002 WY 92, ¶ 26, 48 P.3d at 1071 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722-23, 123 L.Ed.2d 353 (1993)).

> A reviewing court does not examine whether there was sufficient evidence to support the conviction in the absence of the constitutional error. Rather, ordinarily, we must ask whether the verdict was surely unattributable to the error. If, after conducting such an inquiry, we conclude that the error had a "substantial and injurious effect or influence," we must set aside the jury's findings. The State bears the burden that an error is harmless under this standard.

*Id.* (internal citations omitted).

[¶73] The State charged Mr. Mills with first-degree premeditated murder. The district court instructed the jury on the elements of that offense as well as the lesser included offenses of second-degree murder and voluntary manslaughter.[7] The jury returned a verdict of not guilty on the first-degree murder charge and guilty on the second-degree murder charge.

[¶74] To make its case for second-degree murder, the State was required to prove that "the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, *and* that the act was done without legal justification or excuse." *Pickering v. State*, 2020 WY 66, ¶ 88 n.21, 464 P.3d 236, 261 n.21 (Wyo. 2020) (quoting *Wilkerson v. State*, 2014 WY 136, ¶ 27, 336 P.3d 1188, 1200 (Wyo. 2014)) (emphasis in original). The State also had the burden of showing, beyond a reasonable doubt, the absence of a sudden heat of passion. *Schmuck v. State*, 2017 WY 140, ¶ 29, 406 P.3d 286, 296 (Wyo. 2017).

---

[7] Mr. Mills, not the State, requested the voluntary manslaughter instruction, but the State did not object to it. The district court found there was sufficient evidence to warrant the instruction.

[¶75] A conviction for voluntary manslaughter required a showing that Mr. Mills unlawfully killed Mr. Bartlett "without malice, expressed or implied, . . . voluntarily, upon a sudden heat of passion." *Jacobs v. State*, 2021 WY 104, ¶ 13, 495 P.3d 303, 308 (Wyo. 2021) (quoting Wyo. Stat. Ann. § 6-2-105(a)(i) (LexisNexis 2021)).

> "Heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation, and from passion rather than from judgment. The heat of passion must be aroused suddenly, and the act resulting in death must occur while the defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.

*Id.* (quoting *Farrow v. State*, 2019 WY 30, ¶ 35, 437 P.3d 809, 820 (Wyo. 2019)).

[¶76] We have held that Mr. Mills was in custody after he first admitted he shot Mr. Bartlett. The district court accurately summarized the statements Mr. Mills made after that point, which based on our holding should have been suppressed:

> After the Defendant admitted that he shot Trevor, Detective Donahue asked how it happened. In response, the Defendant described how Trevor talked in detail about carrying out his plans of violence and suicide. The Defendant told Trevor he could not do that, and if he wanted to kill himself then to just do it. Trevor responded that he couldn't – he had tried in the past but he couldn't. So Trevor then asked the Defendant to be a true friend and do it for him. In response, the Defendant grabbed his gun and confirmed that this is what Trevor wanted. The Defendant then put a round in the chamber and once again confirmed Trevor's wishes. Once confirmed, the Defendant shot Trevor in the head. He put the gun down, panicked, told his wife what he had done, and then talked her out of calling the police.

[¶77] Without the suppressed statements, the only evidence of what happened when Mr. Mills shot Mr. Bartlett, in this record, is the crime scene evidence, and Mr. Mills' efforts to cover up the crime by lying to law enforcement and throwing away the clothes he was

wearing.[8] The evidence no doubt ruled out suicide, and it may also have been sufficient to persuade the jury that the crime was second-degree murder, rather than voluntary manslaughter. But, as *Lewis* instructs, that is not the question. The question is whether Mr. Mills' statements had a "substantial and injurious effect or influence" on the jury's verdict. *Lewis*, 2002 WY 92, ¶ 26, 48 P.3d at 1071. The only conclusion we can reach is that they did.

[¶78]  The statements undermined any claim of provocation or heat of passion, and Mr. Mills' details of the crime clearly fit the crime of second-degree murder. Not surprisingly, the prosecutor relied heavily on Mr. Mills' details of the crime in closing argument, and in fact closed his rebuttal argument with: "The defendant purposefully and either with a premeditated malice or maliciously killed Trevor Bartlett, and it was not done under a sudden heat of passion. Don't take my word for it, take his." Under the circumstances, the error in admitting the statements Mr. Mills made after his interrogation became custodial requires reversal.

### III. The record supports the district court's conclusion that Mr. Mills' statement was voluntary.

[¶79]  Though related to the *Miranda* issue, the question of voluntariness of a confession must be addressed separately. "A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation, coercion or deception, makes it." *Siler v. State*, 2005 WY 73, ¶ 24, 115 P.3d 14, 25-26 (Wyo. 2005) (quoting *Lara v. State,* 2001 WY 53, ¶ 9, 25 P.3d 507, 510 (Wyo. 2001)). This is because the Fifth and Fourteenth Amendments to the United States Constitution require that a statement be voluntary. *Snyder*, 2021 WY 108, ¶ 38, 496 P.3d at 1250 (citing *State v. Evans*, 944 P.2d 1120, 1124 (Wyo. 1997)). "A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial." *Hicks v. State*, 2008 WY 83, ¶ 20, 187 P.3d 877, 881 (Wyo. 2008) (quoting *Goulart v. State*, 2003 WY 108, ¶ 6, 76 P.3d 1230, 1233 (Wyo. 2003)). Additionally, although statements taken in violation of *Miranda* are inadmissible in the prosecution's case in chief, they may be used for impeachment purposes on cross-examination if they are voluntary. *Elstad*, 470 U.S. at 307, 105 S.Ct. at 1292 (citing *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)).

[¶80]  "Voluntariness is a question of law that we review de novo." *Schwartz*, 2021 WY 48, ¶ 15, 483 P.3d at 866. As noted earlier, however, "we adopt the district court's factual findings unless they are clearly erroneous." *Id.* at ¶ 9, 483 P.3d at 864.

---

[8] Mr. Mills invoked the spousal privilege as to the statements he made to his wife, and the State did not object to that invocation or call her to testify. Because the State did not object, the district court did not rule on whether the privilege precluded Ms. Mills' testimony. The State likewise did not call Mr. Mills' daughter to testify as to the conversation she overheard between Mr. Mills and his wife.

27

[¶81]  "In determining voluntariness, we examine the totality of the circumstances that existed when the statements were made." *Id.* at ¶ 15, 483 P.3d at 866 (quoting *Gunn*, 2003 WY 24, ¶ 18, 64 P.3d at 722). Many factors inform the analysis, including:

> [T]he atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made, whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id.* (quoting *Gunn*, 2003 WY 24, ¶ 12, 64 P.3d at 721) (alterations in *Gunn*).

[¶82]  Before turning to our review of the district court's ruling, we must first determine what parts of the record we may consider in conducting that review. Mr. Mills contends his statement to Detective Donahue was involuntary in part because he was "almost certainly still intoxicated when giving his statement[.]" In so arguing, he points to the trial testimony of his expert witness on the likely amount of alcohol that remained in his system after his evening of drinking and its effects on him. The State argues that the testimony is not properly considered because the testimony was not presented in the suppression hearing and Mr. Mills did not renew his motion to suppress at trial. We agree.

[¶83]  In support of its argument, the State cites a Tenth Circuit Court of Appeals decision in which the court held that "unless a party asks the district court to reconsider its decision at trial, we will not consider trial evidence which undermines a district court decision rendered at a pretrial suppression hearing." *United States v. Parra*, 2 F.3d 1058, 1065 (10th Cir. 1993) (internal citation omitted). The court reasoned:

Defense counsel, as well as prosecutors, are required to bring alleged errors to the trial court's attention by making a proper objection or filing a motion. Trial courts are not generally bound to act *sua sponte*. The burden should not be on the court constantly to compare the evidence at trial with that from the earlier hearing. The parties thus have an incentive to make their objections known at the trial stage where corrections can be made without having to redo the entire proceeding.

*Id.* (quoting *United States v. Hicks*, 978 F.2d 722, 724-25 (D.C. Cir. 1992)).

[¶84] This approach is sound, as is its reasoning. Additionally, it comports with our view that although we consider legal conclusions de novo in reviewing a suppression ruling, "[i]t is a vital function of trial courts to make findings of fact based on evidence it believes credible." *Johnson v. State*, 2009 WY 104, ¶ 22, 214 P.3d 983, 989 (Wyo. 2009). We therefore will not consider the trial evidence in our review of the district court's ruling that Mr. Mills' confession was voluntary.

[¶85] Mr. Mills claims that his statements were induced because he was intoxicated, sleep deprived, and traumatized by the death of his friend. He contends that Detective Donahue took advantage of his vulnerable state by failing to advise him of his *Miranda* rights, while at the same time telling him it would be to his benefit to tell the truth. He argues the detective's assurances were an inducement to confess.

[¶86] Detective Donahue's failure to advise Mr. Mills of his *Miranda* rights is a factor that weighs against voluntariness, but the remainder of his argument is undercut by the district court's specific findings of fact. The court found Mr. Mills voluntarily arrived at the police station, was unrestrained, sat a comfortable distance from Detective Donahue, and that no physical or mental threats or promises were made. It noted that Mr. Mills may have been a bit hungover and tired, but the recorded interview showed him to be alert, responsive, and coherent, and he walked without stumbling or staggering. The court also observed that Mr. Mills spoke in a comprehensible tone and was not slurring his words, and it appeared that he was in complete control of his faculties, was aware of the situation, and that he responded accordingly.

[¶87] The district court further found the atmosphere of the interview to be "polite, professional, calm, and courteous." It concluded:

Detective Donahue did not lie to the Defendant, he did not threaten him, nor did he tell him what to say. Having watched the recording several times, the court can reasonably infer a host of reasons why the Defendant finally provided the statement he did, however, none of those include the fact that

the Defendant's free will was overborne by the coercion or improper inducement of Detective Donahue.

[¶88] For Mr. Mills' alleged intoxication to be a factor in the voluntariness of his confession, the record would have to show he "was so intoxicated he was unable to appreciate the nature and consequences of his statements." *Schwartz*, 2021 WY 48, ¶ 16, 483 P.3d at 866 (quoting *Siler*, 2005 WY 73, ¶ 25, 115 P.3d at 26). The district court found the opposite, and based on our review of the recorded interview, we find no clear error in that finding.

[¶89] The district court's finding that Detective Donahue made no promises to Mr. Mills is likewise supported by the record. *See United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) ("[I]t is for the trier of the facts to determine whether promises by an official were made[.]") (quoting *Reed v. Turner*, 444 F.2d 206, 208 (10th Cir. 1971)). At most, Detective Donahue encouraged Mr. Mills to tell the truth so he could help him. Such statements do not rise to the level of a promise or inducement. *See*, *e.g.*, *United States v. Young*, 964 F.3d 938, 944 (10th Cir. 2020) ("[T]he fact that an officer promises to make a defendant's cooperation known to prosecutors will not produce a coerced confession[.]") (quoting *Lopez*, 437 F.3d at 1064); *see also People v. Zadran*, 314 P.3d 830, 834-35 (Colo. 2013) (officer's statement "I think it would be in your best interest to talk to me" was not coercion); *State v. Nadeau*, 1 A.3d 445, 466 (Me. 2010) (officer's statement that "the more cooperative you are, the better things are for you," was not implicit threat or concrete promise of leniency); *State v. Pinder*, 736 A.2d 857, 880 (Conn. 1999) ("Encouraging a suspect to tell the truth does not, as a matter of law, overcome a confessor's will[.]") (quoting *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978)).

[¶90] We find no clear error in the district court's findings of fact. Its legal conclusion that Mr. Mills' statement to Detective Donahue was voluntary is supported by those findings.

## *CONCLUSION*

[¶91] The district court erred in determining when Mr. Mills' interrogation became custodial, and that error requires reversal. However, the record supports the district court's conclusion that Mr. Mills' statement was voluntary. We reverse in part, affirm in part, and remand.